Marc D. Fink (MN Bar No. 343407)
Center for Biological Diversity
209 East 7th Street
Duluth, Minnesota 55805
Tel: 218-464-0539
Email: mfink@biologicaldiversity.org
*Applicant Pro Hac Vice*

*Attorney for Proposed Defendant-Intervenor*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Douglas A. Ducey, Governor of Arizona, in his official capacity,<br><br>        Plaintiff,<br><br>vs.<br><br>Randy Moore, Chief of the United States Forest Service, in his official capacity, *et al.*,<br>        Defendants,<br><br>and<br><br>Center for Biological Diversity,<br>        Proposed Defendant-Intervenor.<br>_____ | No. 22-cv-01814-DMF<br><br>**CENTER FOR BIOLOGICAL DIVERSITY'S MOTION TO INTERVENE** |

**MOTION**

The Center for Biological Diversity ("the Center") respectfully moves for leave to intervene as a defendant in this case. The Center's motion is supported by the supporting memorandum and the Declarations of Dr. Robin Silver and Russ McSpadden, filed herewith. The Center has also lodged its proposed Answer to Plaintiff's Complaint. Counsel for the Center contacted counsel for Plaintiff and Defendants requesting their positions on the Center's motion. Plaintiff opposes the motion, and the Defendants are reserving their position on the motion until they see the filings.

**MEMORANDUM**

Plaintiff Governor Ducey of Arizona, through the State's agencies, is installing thousands of shipping crates to create a border barrier on miles of federal land without permission from the federal government and in violation of federal law. In doing so, the Governor is eliminating the last remaining wildlife corridors between Arizona and Mexico, causing significant harm to endangered species such as the jaguar and ocelot that depend on connectivity habitat with Mexico for their long-term survival and recovery.



1

McSpadden Declaration, ¶ 17. The Governor is also undertaking this major action without any compliance with federal environmental laws including the National Environmental Protection Act ("NEPA"), the Endangered Species Act ("ESA"), and the National Forest Management Act ("NFMA"), which require procedural and substantive protections for the public and the environment. The Governor has brazenly ignored clear direction from the federal agencies to stop these damaging activities.

The Center has a long-standing interest in the protection and recovery of endangered wildlife that use the areas affected by the Governor's activities, including the jaguar and ocelot, and in the environmentally responsible management of the border region between Arizona and Mexico. For instance, the Center has engaged in administrative processes and court cases for decades to ensure that the jaguar receives the protections mandated by the ESA, and the Center has challenged multiple decisions of the federal government concerning its border related activities. The Governor's lawsuit threatens to directly and significantly impair the Center's and its members' interests in these endangered species and in the environment along the southern border.

Through this lawsuit, the Governor is explicitly attempting to circumvent federal environmental review for his activities at the border. Doc. 1 (Complaint), ¶ 62 (seeking to avoid "the web of environmental reviews"). More fundamentally, the Governor seeks to remove federal jurisdiction and control over the state's activities at the border, which would thereby eliminate all federal environmental laws and protections. *Id.*, ¶ 73 (seeking "an injunction barring any federal governmental actors, including the Forest Service and [Bureau of Reclamation], from attempting to exercise jurisdiction over the Roosevelt Reservation in the State."); *id.*, p. 19, ¶ G (seeking to "[p]ermanently enjoin any federal governmental actors, including the Forest Service and [Bureau of Reclamation], from attempting to exercise exclusive jurisdiction over the Roosevelt Reservation in the State and allow the State to take appropriate actions, separately and in coordination with federal partners, to protect its citizens and their property.").

The Center satisfies the four-part test for intervention as of right under Federal Rule of Civil Procedure 24(a)(2).  First, the Center's motion to intervene is timely, as the Governor's Complaint was filed on October 21, 2022, and the Defendants have yet to file a responsive pleading.  Second, the Center has a demonstrable interest in the protection and recovery of endangered wildlife species that migrate between Arizona and Mexico at the southern border, as well as in the environment of the border region more generally.  Third, a decision in the Governor's favor enjoining Defendants from exercising jurisdiction and authority over the federal lands at the border, and allowing the Governor to continue closing off the remaining wildlife corridors at the border, would significantly impair the Center's ability to protect its interests in the wildlife species that depend on connectivity habitat with Mexico, and in the federal public lands along the border.  Fourth, Defendants do not adequately represent the Center's interests in this case, as the Center has previously challenged multiple actions by the federal government at the border concerning related issues, and has also repeatedly challenged prior actions by Defendants concerning the endangered jaguar and its critical habitat.  Defendants will also likely focus primarily on the major constitutional and jurisdictional issues in this case, while the Center will focus on the potential for the Governor's activities and his requested relief to severely harm endangered species and the environment.

Accordingly, the Court should grant the Center's motion for leave to intervene as a matter of right.  In the alternative, the Center also satisfies the requirements for permissive intervention under Federal Rule of Civil Procedure 24(b).

**BACKGROUND**

The Governor is currently installing a border barrier on miles of federal land along the Arizona-Mexico border, using shipping crates.  Doc. 1 (Complaint), Exhibit 6.[1]  This is despite a clear explanation and direction from the United States Forest Service ("Forest Service") that the Governor must obtain federal regulatory approval prior to undertaking

---

[1] *See also* Silver Declaration, ¶ 10, Exhibit A; McSpadden Declaration, ¶ 17.

3

these activities on National Forest land. Doc. 1, Exhibit 5. As explained by the Forest Service, the Governor must first apply for and obtain a federal permit, as required by 36 C.F.R. § 251.54. *Id*. Moreover, prior to the permit being issued, the Forest Service must analyze the Governor's request to ensure that the requested action complies with federal environmental laws such as NEPA. *Id*. The Forest Service explicitly directed the Governor to refrain from any further activity associated with the shipping containers on federal Forest Service lands, "until such time as proper authorization is secured." *Id*.

The United States Bureau of Reclamation ("Bureau") similarly notified the Governor that "[t]he unauthorized placement of these containers constitutes a violation of federal law and is a trespass against the United States." Silver Declaration, Exhibit A. According to the Bureau, "[t]hat trespass is harming federal lands and resources impeding Reclamation's ability to perform its mission." *Id*. The Governor, however, has willfully ignored these instructions and warnings from the federal agencies, and is proceeding without a federal permit, without any compliance with NEPA or other federal environmental laws, and is presently trespassing on and degrading the border lands.

The Center, headquartered in Tucson, Arizona, is the preeminent conservation organization in the United States that is focused on the survival and recovery of endangered species. The Center works to secure a future for all species, great and small, hovering on the brink of extinction. Silver Declaration, ¶ 6. The southern border lands where the Governor is unlawfully installing shipping containers, and where he seeks through this lawsuit to continue installing and maintaining shipping containers without any federal review or oversight, are located within established, critical movement corridors between occupied habitat in the United States and Mexico for the jaguar and ocelot, both of which are designated and protected under the ESA, and both of which have been sighted and documented in the area. *See* Silver Declaration, ¶ 11, Exhibit B.

The ESA requires the United States Fish and Wildlife Service ("FWS") to list species that it determines are threatened or endangered with extinction. 16 U.S.C.

4

1533(a). FWS originally designated the jaguar as an endangered foreign species in 1972. *Ctr. for Biological Diversity v. Kempthorne*, 607 F. Supp. 2d 1078, 1082 (D. Ariz. 2009). The jaguar's range stretches from southern Arizona and New Mexico south through South America. *Id*. at 1080. In 1996, the Center filed suit to compel FWS to make a final listing decision for the jaguar, which resulted in FWS listing the jaguar as an endangered species in the United States in 1997. *Id*. at 1082. In its listing decision, "FWS placed particular emphasis on the maintenance of cross-border wildlife corridors along the U.S.-Mexico border as a critical element in ensuring the species' recovery within the U.S." *Id*.

The ESA also requires FWS, concurrently with listing a species as threatened or endangered, to designate "critical habitat" for the species. *Ctr. for Biological Diversity,* 607 F. Supp. 2d at 1086, citing 16 U.S.C. § 1533(a)(3). "The designation of critical habitat is 'the principal means for conserving an endangered species, by protecting not simply the species, but also the ecosystem upon which the species depends.'" *Id*., quoting *Ctr. for Biological Diversity v. Norton*, 240 F. Supp. 2d 1090, 1101 (D. Ariz. 2003). For the jaguar, however, FWS determined in 1997 that the designation of critical habitat would "not be prudent," and then in 2006 that it would "not be beneficial." *Id*. at 1088. The Center judicially challenged and reversed this determination (*id*. at 1094-95), resulting in FWS finally designating critical habitat for the jaguar in 2014. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,* 441 F. Supp. 3d 843, 871 (D. Ariz. 2020). This critical habitat designation again recognized the importance of connectivity between Arizona and Mexico for the jaguar's conservation, as the lands designated in Arizona are used to connect jaguars to breeding populations in Mexico. *Id*. at 874. These "[c]onnection corridors are essential, but often under-protected." *Id*.

The ESA further requires FWS to develop and implement "recovery plans" for threatened and endangered species. 16 U.S.C. § 1533(f)(1). The Center also had to file suit against FWS in order to compel the statutorily required recovery plan for the jaguar.

*Ctr. for Biological Diversity*, 607 F. Supp. 2d at 1092-94.  FWS finally completed the Jaguar Recovery Plan in 2018, and a map from the Recovery Plan identifies the habitat connectivity and corridors for the jaguar between Arizona and Mexico:



Silver Declaration, Exhibit C, p. 3.  As described by FWS, "[a] visual examination of this connectivity model . . . reveals three corridors that extend across the U.S.-Mexico border." *Id.*

If the Governor had complied with federal law prior to undertaking the ongoing activities at the border, the Forest Service would have been required to ensure that the Governor's proposal was consistent with the laws, regulations and policies that govern the National Forest System, including the land and resource management plan for the Coronado National Forest, prior to issuing the required permit.  36 C.F.R. § 251.54(e)(1).  The Forest Service would have also had to involve the public and consider the potential environmental consequences of the Governor's proposal, along with less damaging alternatives to that proposal, prior to issuing a permit, as required by NEPA.  42 U.S.C. § 4332(2)(C).  And the Forest Service would have been required to consult with FWS on

the Governor's proposal, pursuant to Section 7 of the ESA, to ensure that the proposal was not likely to jeopardize any threatened or endangered species, or result in the destruction or adverse modification of critical habitat.  16 U.S.C. § 1536(a)(2).  The Governor's lawsuit seeks to insulate the past, ongoing, and future installation and maintenance of his border barrier from compliance with these federal mandates.

## LEGAL STANDARD

Federal Rule of Civil Procedure 24(a)(2) provides:

> On a timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed. R. Civ. P. 24(a)(2).  Thus, to be granted intervention of right, the applicant must show that four requirements are met: (1) the motion is timely; (2) the applicant has a significant protectable interest relating to the property or transaction that is the subject of the action; (3) that without intervention, the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the existing parties may not adequately represent the applicant's interests.  *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011).  These four requirements "are broadly interpreted in favor of intervention." *Id.*; see also *State ex rel. Lockyer v. United States*, 450 F.3d 436, 440 (9th Cir. 2006) (stating that the Ninth Circuit "construe[s] Rule 24(a) liberally in favor of potential intervenors.").  To determine whether intervention is appropriate, "courts are guided primarily by practical and equitable considerations," and "are required to accept as true the non-conclusory allegations made in support of intervention."  *RHN Inc. v. CNA Nat'l Warranty Corp.*, 2020 U.S. Dist. LEXIS 243525, *4 (D. Ariz., Dec. 29, 2020), citing *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 819 (9th Cir. 2001); *see also* Fed. R. Civ. P. 24(a)(2) (advisory committee note, stating that "[i]f an [applicant] would be substantially

affected in a practical sense by the determination made in an action, [the applicant] should, as a general rule, be entitled to intervene . . . .").

Rule 24(b) also provides that the court may permit anyone to intervene who submits a timely motion and has a claim or defense that shares with the main action a common question of law or fact. Fed. R. Civ. P. 24(b)(1)(B). "The decision is discretionary and 'subject to considerations of equity and judicial economy.'" *Harris v. Ariz. Indep. Redistricting Comm'n*, 2012 U.S. Dist. LEXIS 164882, *20 (D. Ariz., Nov. 16, 2012), quoting *Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 777 (9th Cir. 1990).

## ARGUMENT

The Center satisfies each of the four elements of the Rule 24(a) test and qualifies for intervention as of right. Alternatively, the Court should allow the Center to intervene under Rule 24(b).

### I. The Center satisfies the test for intervention as of right.

There is no question that the Center's motion to intervene is timely. The Center has a longstanding interest relating to the subject matter of the Governor's Complaint, and the lawsuit represents a potential, severe impairment of the Center's ability to protect its interests in endangered species such as the jaguar and ocelot that depend on connectivity habitat between Arizona and Mexico for their survival and recovery. It is also likely that Defendants will not adequately represent the Center's interests in this case. The Court should therefore grant the Center's request to intervene as of right.[2]

---

[2] The Center also has standing to participate as a party in this case. To establish standing, the Center "must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the [plaintiff], and that it is likely that a favorable decision will redress that injury." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007). The Center has submitted declarations demonstrating its members' use and enjoyment of the border lands adversely affected by the Governer's installation of shipping containers along the border. McSpadden Dec., ¶¶ 3-9; Silver Dec., ¶¶ 14, 24. The declarations explain how the members' use of these lands are being adversely affected. McSpadden Dec., ¶¶ 17-21; Silver Dec., ¶¶ 25-27. These injuries are caused by the Governor's unauthorized actions, and will be redressed if the Center is granted

### A. The Center's Motion to Intervene is Timely.

Whether a motion to intervene is timely is based on the stage of the proceeding, prejudice to the other parties, and the reason for and length of the delay. *United States v. Oregon,* 913 F.2d 576, 588 (9th Cir. 1990). The Center's motion is timely, as it is filed less than two weeks after the Governor filed his Complaint, and well before Defendants are due to file their responsible pleading, and there is no prejudice to any party.

### B. The Center has a significant, protectable interest in endangered species that migrate between Arizona and Mexico, and in the condition of the environment at the southern border.

An applicant for intervention must claim "an interest relating to the property or transaction which is the subject of the action" and be "so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest." Fed. R. Civ. P. 24(a)(2). Whether an applicant demonstrates sufficient interest in a case is a practical, threshold inquiry, and the applicant does not have to establish a specific legal or equitable interest. *Citizens for Balanced Use*, 647 F.3d at 897. The applicant "must establish that the interest is protectable under some law and that there is a relationship between the legally protected interest and the claims at issue." *Id.*; see also *Cnty. of Fresno v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980) (the "interest" test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process."). "By allowing a party with a practical interest to intervene, courts prevent or simplify future litigation that otherwise might occur." *Ctr. for Biological Diversity v. United States Forest Serv.*, 2016 U.S. Dist. LEXIS 90163, *5 (D. Ariz., June 10, 2016).

The Center has significant interests at stake in this case, which are protected by the ESA, NEPA, and other federal laws, and which are at risk due to the Governor's claims and requested relief. First, the Center has been engaged in litigation for decades to

---

intervention and the Governor's actions are found to be unlawful, and the containers are removed and the border region is restored. McSpadden Dec., ¶ 22; Silver Dec., ¶ 28.

compel protections for the jaguar as required by the ESA, including the designation of critical habitat at the southern border in Arizona. The Center filed suit in 1996 "to compel [FWS] to make a final listing decision for the jaguar." *Ctr. for Biological Diversity*, 607 F. Supp. 2d at 1082. In the resulting 1997 Final Listing Rule, FWS determined that critical habitat for the jaguar was "not prudent," which the Center challenged in 2003. *Id*. This resulted in a settlement agreement, and in 2006 FWS again declined to designated critical habitat for the jaguar, which the Center again challenged as unlawful under the ESA. *Id*. at 1088. This court again ruled for the Center in 2009 (*id*. at 1091, 1094-95), resulting in FWS finally designating critical habitat for the jaguar in 2014. 79 Fed. Reg. 12572 (March 5, 2014). The Center also successfully challenged FWS' failure to prepare a recovery plan for the jaguar, as required by the ESA. *Ctr. for Biological Diversity*, 607 F. Supp. 2d at 1094-95.

The Center subsequently intervened in two lawsuits to help FWS defend its 2014 final rule designating jaguar critical habitat from challenges in both New Mexico and Arizona. *N.M. Farm & Livestock Bureau v. U.S. Dept. of Interior*, 952 F.3d 1216 (10th Cir. 2020) (reversing the decision of the district court which had upheld the designation of critical habitat for the jaguar in New Mexico); *Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, 441 F. Supp. 3d 843, 874-75 (D. Ariz. 2020) (denying Rosemont's cross claims challenging the jaguar critical habitat designation in parts of Arizona). The case concerning the jaguar's critical habitat in Arizona remains active, as the parties await a decision by the United Court of Appeals for the Ninth Circuit.

Second, the Center has long been involved in efforts to obtain the necessary and required protections for the endangered ocelot, which also relies on the border region to travel between southern Arizona and Mexico. For example, in 2010, the Center submitted comments on a draft Recovery Plan for the ocelot. Silver Declaration, Exhibit F. And in 2016, the Center filed suit against the Animal and Plant Health Inspection

Service concerning the impacts of its wildlife damage management program on ocelots, which led to a favorable settlement agreement in 2017.  *Id.*, Exhibit G.

Third, the Center also has a longstanding interest in the health and condition of the environment at the southern border, and has filed numerous legal challenges to federal agency decisions and activities at the border to protect these interests.  In *Center for Biological Diversity v. Mayorkas*, 2021 U.S. Dist. LEXIS 159034, *15, 28-29 (D. Ariz., Aug. 23, 2021), this court held that the Department of Homeland Security had violated NEPA by failing to supplement a programmatic NEPA analysis for its activities along the southern border.  In *Center for Biological Diversity et. al., v. Austin et al.*, No. 19-CV-408 and *Center for Biological Diversity et. al., v. Austin et al.*, Case No. 20-CV-1230, both filed in the United States District Court for the District of Columbia, the Center challenged the construction of border barriers on the southern border using United States Department of Defense funds.  These cases resulted in a settlement agreement on March 24, 2022.  Silver Declaration, Exhibit H.  In bringing these cases and in implementing the Center's broader campaign concerning the southern border wall, the Center devoted considerable staff time and effort over a period of years to tracking and documenting the significant environmental impacts of border wall construction and activities.  *Id.*, ¶ 15.

The courts have found similar interests in endangered wildlife and federal public lands to be protectable and sufficient in considering motions to intervene from conservation organizations.  *Citizens for Balanced Use*, 647 F.3d at 897 (recognizing applicant's interest in preserving the wilderness character of portions of a national forest); *United States v. Carpenter*, 526 F.3d 1237, 1240 (9th Cir. 2008) (recognizing applicant's interest in federal wilderness area); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1398 (9th Cir. 1995) (recognizing applicant's interest in an endangered species and it's habitat); *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983) (recognizing the applicant's interest "in the preservation of birds and their habitats.").

11

**C.   The Center's interest in endangered species, and in the environment at the southern border lands, are threatened by the Governor's complaint and requested relief.**

"Generally, after finding that a proposed intervenor has a significant protectable interest, courts have little difficulty concluding that the disposition of the case may affect it." *Ctr. for Biological Diversity*, 2016 U.S. Dist. LEXIS 90163, at *8, citing *Lockyer v. United States*, 450 F.3d 436, 442 (9th Cir. 2006). The same holds true in this case.

The Governor's claims and request for relief present a significant risk to the Center's long-standing interests in endangered species including the jaguar and ocelot, and the environment more generally at the southern border. The Governor seeks to eliminate his obligations under federal law to obtain approval from the federal government and to comply with federal environmental laws prior to taking action on the federal lands at the southern border. As the Forest Service explained to the State:

> As we discussed previously, the process for obtaining a permit is outlined in 36 C.F.R. 251.54. . . Upon receipt of the required information, the Forest Service will assess the information provided against initial screening criteria outlined in the regulations. If the proposal passes the applicable screening criteria, it will also have to be analyzed for effects on the environment in compliance with the National Environmental Protection Act and other federal law.

> Meanwhile, please refrain from any further activities associated with the containers on NFS lands, including the use of any equipment, until such time as proper authorization is secured.

Doc. 1, Exhibit 5. The Bureau of Reclamation similarly notified the State:

> The unauthorized placement of those containers constitutes a violation of federal law and is a trespass against the United States (43 C.F.R. Part 423; 43 C.F.R. Part 429). That trespass is harming federal lands and resources and impeding Reclamation's ability to perform its mission.

Silver Declaration, Exhibit A.

The Governor's complaint seeks to abolish federal oversight, authority and approval over whatever actions he wishes to take at the southern border, and to thereby

eliminate all federal laws, regulations, and protections for endangered species and the environment. More specifically, the Governor explicitly seeks to avoid federal environmental review for his border activities. Doc. 1, ¶ 62. The Governor seeks an injunction "barring any federal government actors" from attempting to exercise jurisdiction over the border lands in Arizona. *Id.*, ¶ 73. And the Governor requests that the federal government be permanently enjoined from exercising jurisdiction over the border lands, and that the State be allowed to take any actions "to protect its citizens and their property." *Id.*, p. 19, ¶ G.

In fact, the Governor is already taking major action at the southern border, through the installation of thousands of shipping containers, without any approvals from the federal government, and without any attempted compliance with the applicable federal environmental laws. Silver Declaration, ¶ 10, Exhibit A; McSpadden Declaration, ¶ 17. The Governor is therefore already significantly harming the Center's interests in the endangered species that rely on the border as a wildlife corridor, and in the environment more generally at the border. Through this lawsuit, the Governor seeks to provide legal cover for his unauthorized, ongoing border barrier activities at the southern border.

The Ninth Circuit has long determined that conservation organizations such as the Center are entitled to intervene as of right where, as here, the litigation threatens harm to wildlife and other natural resource values that are important to the organization's mission and where the organizations have worked to protect those values. *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1398 (9th Cir. 1995) (affirming the granting of intervention where the case could impair the conservation organizations' ability to protect their interest in an endangered species and it's habitat); *Sagebrush Rebellion, Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983) (affirming the granting of intervention to the National Audubon Society, and finding "no serious dispute" where an adverse decision "would impair the society's interest in the preservation of birds and their habitats.").

**D.     The Center's interests are not adequately represented by existing parties.**

Intervention shall be granted to any timely applicant with a significant protectable interest that may be impaired if intervention is denied "unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2); *Berger v. N.C. State Conf. of the NAACP*, 142 S. Ct. 2191, 2203 (2022). "The burden of showing inadequacy of representation is 'minimal' and satisfied if the applicant can demonstrate that representation of its interests 'may be' inadequate." *Citizens for Balanced Use*, 647 F.3d at 898, quoting *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003). In evaluating the adequacy of representation, the Ninth Circuit considers: (1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments, (2) whether the present party is capable and willing to make such arguments, and (3) whether a proposed intervenor would offer any necessary elements to the proceedings that other parties would neglect. *Citizens for Balanced Use*, 647 F.3d at 898. The most important factor is how the applicant's interests compare with the interests of existing parties. *Id*.

Here, it is clear from the Governor's Complaint that his focus will be on human migrants and migration across the border and the resulting impacts on Arizona and its citizens, and not at all on the potential negative impacts to endangered wildlife and the environment from the State's ongoing activities at the border. Doc. 1, ¶ 1. Due the precedent-setting nature of the Governor's constitutional challenges, Defendants are likely to be primarily focused on those legal issues, and the related ownership, jurisdiction, and authority over the southern border lands. The Center's intervention would provide a unique and unrepresented perspective concerning the endangered wildlife, critical habitat, and general environment of the border lands, which may be entirely neglected by the other parties.

Although the Ninth Circuit has stated that there is an assumption of adequacy when the government is acting on behalf of a constituency that it represents, *Citizens for Balanced Use*, 647 F.3d at 898, the Supreme Court has recently cast doubt on any such presumption, stressing instead that this factor generally presents proposed intervenors "with only a minimal challenge." *Berger*, 142 S. Ct. at 2203.  In *Berger*, the Court discussed its earlier decision involving a request to intervene by a private party who asserted a related interest to that of an existing government party.  *Berger*, 142 S. Ct. at 2203, citing *Trbovich v. Mine Workers*, 404 U.S. 528 (1972).  While the Court in *Trbovich* had recognized the interests were related, and aligned "at a high level of abstraction," the interests were not identical.  *Id*. at 2203-04.  Thus, "[r]ather than endorse a presumption of adequacy," the Court stressed that its holding in *Trbovich* was that the movant's burden should be "treated as minimal." *Id.* at 2204, quoting *Trbovich*, 404 U.S. at 538, n. 10. The Center easily satisfies this "minimal" burden here.

As in *Berger* and *Trbovich*, the interests of the Center and the Defendants in this case are not "identical" and do not "overlap fully." *Berger*, 142 S. Ct. at 2204.  In fact, "[t]he Ninth Circuit has acknowledged that a federal agency, such as the Forest Service, 'is required to represent a broader view than the more, narrow, parochial interests' of a proposed [intervenor]." *Ctr. for Biological Diversity v. Zinke*, 2018 U.S. Dist. LEXIS 121402, *10-11 (D. Ariz., July 20, 2018), quoting *Forest Conservation Council v. United States Forest Serv.*, 66 F.3d 1489, 1499 (9th Cir. 1995), abrogated on other grounds by *Wilderness Soc'y v. United States Forest Serv.*, 630 F.3d 1173 (9th Cir. 1995); see also *Ctr. for Biological Diversity*, 2016 U.S. Dist. LE XIS 90163, at *9 (same).

In responding to the Governor's claims and request for relief, the Defendants will likely be balancing the important interests in national security, immigration policy, and cordial relations with the State of Arizona, as well as environmental protections.  This apparent balancing of interests is indicated by Defendants full knowledge that the Governor has been and is presently acting illegally by installing shipping containers at the southern border, and yet Defendants have not taken any action to stop these

unauthorized activities or to even enter an appearance yet in this case.  The Center, on the other hand, will be narrowly and aggressively focused on compelling the full enforcement of and compliance with all federal environmental laws and protections at the southern border, and in particular the conservation mandate and requirements of the ESA. As the Ninth Circuit recognized in *Citizens for Balanced Use*, the Defendants "representation of the public interest may not be 'identical to the individual parochial interest' of a particular group just because 'both entities occupy the same posture in the litigation.'"  647 F.3d at 899, quoting *WildEarth Guardians v. U.S. Forest Serv.*, 573 F.3d 992, 996 (10th Cir. 2009).

      Further, the Ninth Circuit has recognized that an important factor in finding inadequacy of representation is where there is a history of adversarial proceedings between the proposed intervenor and the party upon which the proposed intervenor must rely.  *See Idaho Farm Bureau Fed'n*, 58 F.3d at 1398 (finding federal agency would not adequately represent environmental group where the challenged agency decision was compelled by that group's prior litigation); *Cnty. of Fresno v. Andrus*, 622 F.2d 436, 439 (9th Cir. 1980) (finding "further reason to doubt" that the Department of Interior would fully protect intervenor's interest in a rulemaking because "the Department began its rulemaking only reluctantly after [the proposed intervenor] brought a law suit against it"). Again, here, the Center had to repeatedly file lawsuits against FWS over a couple of decades to finally secure the protections required by the ESA for the endangered jaguar and its habitat.  And the Center recently sued the federal government multiple times under the prior Administration over the federal government's own destructive border wall related activities at the southern border.

      In sum, the Center "will bring a unique perspective to this lawsuit and add to the dialogue in a meaningful manner." *Ctr. for Biological Diversity*, 2016 U.S. Dist. LEXIS 90163, at *10.  "On whole, the practical considerations of allowing [the Center] to participate in this lawsuit far outweigh any potential downsides," and the Center "has

satisfied all four requirements to intervene as of right." *Id*.

**II.      Alternatively, the Center should be granted permissive intervention.**

On timely motion, the court may permit anyone to intervene who "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B); *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1110 (9th Cir. 2002). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). Given that the Center has an important perspective to impart on this controversy, and that it is moving to intervene shortly after the case was filed, the standards for permissive intervention are satisfied. The Center has also been extensively involved in prior and ongoing litigation concerning the jaguar and its critical habitat, and in multiple challenges to federal decisions concerning border wall construction. *See* Silver Declaration, Exhibit H. Additionally, as explained above, the granting of the motion will not delay this case or prejudice either the Plaintiff or the Defendants.

## CONCLUSION

For the foregoing reasons, the Center has a right to intervene under Federal Rule of Civil Procedure 24(a) as a defendant in this case. In the alternative, the Court should permit the Center to intervene as a defendant pursuant to Rule 24(b).

Dated November 2, 2022.              Respectfully submitted,

/s/ Marc D. Fink
Marc D. Fink (MN Bar No. 343407)
Center for Biological Diversity
209 East 7th Street
Duluth, Minnesota 55805
Tel: 218-464-0539
Email: mfink@biologicaldiversity.org
*Applicant Pro Hac Vice*

*Attorney for Proposed Defendant-Intervenor*