GARY M. RESTAINO
United States Attorney
District of Arizona

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice
ANDREW A. SMITH (NM Bar No. 8341)
Senior Trial Attorney
Natural Resources Section
c/o United States Attorney's Office
201 Third Street N.W., Suite 900
P.O. Box 607
Albuquerque, New Mexico 87103
Phone: (505) 224-1468
andrew.smith@usdoj.gov

*Attorneys for Federal Defendants (additional counsel on signature page)*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **Douglas A. Ducey, Governor of the State of Arizona,** | ) ) ) |
| Plaintiff, | ) ) No. 2:22-cv-01814-PHX-DGC ) |
| v. | ) ) |
| **Randy Moore, Chief of the United States Forest Service, in his official capacity; Camille Calimlim Touton, Commissioner of the United States Bureau of Reclamation, in her official capacity; Thomas J. Vilsack, United States Secretary of Agriculture, in his official capacity; United States Forest Service; and United States Bureau of Reclamation,** | ) **FEDERAL DEFENDANTS'** ) **MOTION TO DISMISS AND** ) **MEMORANDUM IN SUPPORT** ) ) ) ) ) ) ) ) |
| Federal Defendants. | ) ) ) |
| | ) |

## **TABLE OF CONTENTS**

MOTION ............................................................................................................... 1

MEMORANDUM ................................................................................................ 1

BACKGROUND .................................................................................................. 2

STANDARDS OF REVIEW ............................................................................... 5

    I.    MOTIONS TO DISMISS ................................................................... 5

    II.   STANDING AND SOVEREIGN IMMUNITY ................................ 6

ARGUMENT ....................................................................................................... 7

    I.    THE COMPLAINT DOES NOT PRESENT A COGNIZABLE CHALLENGE TO THE ROOSEVELT RESERVATION .................... 7

        A.   The Governor's Challenge to the Roosevelt Reservation Proclamation is Barred by Federal Sovereign Immunity ................................................. 8

        B.   Even with a Waiver of Sovereign Immunity, a Claim Challenging the Roosevelt Reservation Proclamation Would Fail ............................... 12

            1.   The statute of limitations bars any challenge to the Roosevelt Reservation Proclamation ........................................................... 12

            2.   The Roosevelt Reservation Proclamation was a valid exercise of executive authority on its face as a matter of law ...................... 13

            3.   The Roosevelt Reservation Proclamation did not divest land from State ownership ................................................................... 14

    II.   FEDERAL DEFENDANTS DID NOT, AND COULD NOT, DIVEST THEMSELVES OF JURISDICTION OVER FEDERAL LANDS THROUGH THE 2006 MEMORANDUM OF UNDERSTANDING ......................... 17

    III.  ANY "CONCURRENT JURISDICTION" THAT ARIZONA MAY HAVE ON FEDERAL LANDS DOES NOT GIVE GOVERNOR DUCEY AUTHORITY TO OCCUPY AND USE THE PROPERTY OF THE UNITED STATES .......... 20

        A.   Under The Property and Supremacy Clauses, States May Not Occupy and Use Federal Lands without the Consent of Congress ............... 20

i

B.   Governor Ducey's Unauthorized Actions on the Lands of the United
States Directly Conflict with Numerous Federal Laws ....................................22

C.   Arizona's "Concurrent Jurisdiction" Does Not Convey a Right for
Governor Ducey to Occupy and Use Federal Lands and Must Yield to
the United States' Plenary Authority over These Lands...................................25

IV.   THE GOVERNOR'S CONSTITUTIONAL "INVASION CLAUSE" AND
"SELF-DEFENSE CLAUSE" CLAIMS PRESENT NONJUSTICIABLE
POLITICAL QUESTIONS ........................................................................................27

V.   AS A CHALLENGE TO THE UNITED STATES' TITLE, CLAIM FIVE
FAILS FOR THE SAME REASONS AS CLAIM ONE.........................................30

VI.   THE COMPLAINT DOES NOT ALLEGE A COGNIZABLE COMMON
LAW NUISANCE CLAIM .....................................................................................30

A.   The Governor's Nuisance Claim Raises a Non-Justiciable Political
Question ..............................................................................................................31

B.   The Nuisance Claim is Barred by Sovereign Immunity ..................................31

C.   Congress Has Displaced any Federal Common-Law Claim for Nuisance
by Delegating the Control, Protection, and Management of Federal Lands
along the Southern International Border to Federal Agencies..........................33

CONCLUSION .........................................................................................................................34

# TABLE OF AUTHORITIES

**Cases**

*Alabama v. Texas*,
  347 U.S. 272 (1954) ..................................................................27

*Alaska Dep't of Nat. Res. v. United States*,
  816 F.3d 580 (9th Cir. 2016) ....................................................14

*Alaska v. Babbitt*,
  182 F.3d 672 (9th Cir. 1999) ............................................11, 16

*Alaska v. Babbitt*,
  38 F.3d 1068 (9th Cir. 1994) ...........................................12, 40

*Alaska v. United States*,
  545 U.S. 75 (2005) ...................................................................21

*Allen v. Wright*,
  468 U.S. 737 (1984) ....................................................................9

*Am. Elec. Power Co. v. Connecticut*,
  564 U.S. 410 (2011) ..................................................................45

*Arizona v. United States*,
  104 F.3d 1095 (9th Cir. 1997) ............................................37, 38

*Arizona v. United States*,
  567 U.S. 387 (2012) ..................................................................37

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ....................................................................7

*Bartleson v. United States*,
  96 F.3d 1270 (9th Cir. 1996) ....................................................43

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ....................................................................7

*Block v. N.D. ex rel. Bd. of Univ. & School Lands*,
  461 U.S. 273 (1983) .........................................10, 11, 14, 15, 16, 43

*Bonelli Cattle Co. v. Arizona*,
  414 U.S. 313 (1973) ..................................................................21

*Brownell v. Ketcham Wire & Mfg. Co.*,
  211 F.2d 121 (9th Cir. 1954) ....................................................42

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Cal. Coastal Comm'n v. Granite Rock Co.*,
480 U.S. 572 (1987) ..........................................................................................27

*California v. Texas*,
141 S. Ct. 2104 (2021) ........................................................................................9

*California v. United States*,
104 F.3d 1086 (9th Cir. 1997)............................................................37, 38, 39, 41

*Camfield v. United States*,
167 U.S. 518 (1897) .....................................................................................27, 34

*Chadd v. United States*,
794 F.3d 1104 (9th Cir. 2015) ...........................................................................43

*Chiles v. United States*,
69 F.3d 1094 (11th Cir. 1995) ............................................................................38

*City of Milwaukee v. Illinois*,
451 U.S. 304 (1981) ...........................................................................................44

*City of New York v. F.C.C.*,
486 U.S. 57 (1988) .............................................................................................34

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .............................................................................................8

*DSI Corp. v. Sec'y of Housing and Urban Dev.*,
594 F.2d 177 (9th Cir. 1979)..............................................................................43

*Dunn & Black P.S. v. United States*,
492 F.3d 1084 (9th Cir. 2007) .............................................................................9

*Epstein v. Wash. Energy Co.*,
83 F.3d 1136 (9th Cir. 1996)................................................................................7

*FDIC v. Meyer*,
510 U.S. 471 (1994) ...........................................................................................42

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982) ...........................................................................................34

*Firebaugh Canal Water Dist. v. United States*,
712 F.3d 1296 (9th Cir. 2013)............................................................................43

*Gila River Pima-Maricopa Indian Cmty. v. United States*,
494 F.2d 1386 (Ct. Cl. 1974) ...............................................................................2

*Hines v. Davidowitz*,
312 U.S. 52 (1941) .............................................................................................37

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Idaho Sporting Cong., Inc. v. U.S. Forest Serv.*,
  92 F.3d 922 (9th Cir. 1996)..........................................................................................23, 24

*Int'l Paper Co. v. Ouellets*,
  479 U.S. 481 (1987) .............................................................................................................45

*Juliana v. United States*,
  947 F.3d 1159 (9th Cir. 2020)...............................................................................................9

*Kleppe v. New Mexico*,
  426 U.S. 529 (1976) ................................................................................................33, 34, 35

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) .............................................................................................................6

*Lazar v. Kroncke*,
  862 F.3d 1186 (9th Cir. 2017).............................................................................................34

*Leite v. Crane Co.*,
  749 F.3d 1117 (9th Cir. 2014)...............................................................................................6

*Light v. United States*,
  220 U.S. 523 (1911) ...........................................................................................................27

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .............................................................................................................8

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ...........................................................................................................12

*McCarthy v. United States*,
  850 F.2d 558 (9th Cir. 1988)...............................................................................................16

*McMaster v. United States*,
  731 F.3d 881 (9th Cir. 2013)...............................................................................................14

*Mollett v. Netflix, Inc.*,
  795 F.3d 1062 (9th Cir. 2015)...............................................................................................7

*Nat'l Mining Ass'n v. Zinke*,
  877 F.3d 845 (9th Cir. 2017)...............................................................................................19

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
  663 F. Supp. 2d 863 (N.D. Cal. 2009) ...............................................................................42

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
  696 F.3d 849 (9th Cir. 2012)........................................................................................42, 44

*Nesovic v. United States*,
  71 F.3d 776 (9th Cir. 1995).................................................................................................17

*New Jersey v. United States,*
  91 F.3d 463 (3rd Cir. 1996) .................................................................. 39

*Ohio ex rel. Merrill v. State of Ohio, Dep't of Nat. Res.,*
  No. 1:05 CV 818, 2006 WL 8459887 (N.D. Ohio Feb. 14, 2006) ........................... 13

*Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.,*
  429 U.S. 363 (1977) ........................................................................ 21

*Padavan v. United States,*
  82 F.3d 23 (2d Cir. 1996) ............................................................... 38, 39

*Safeway Portland Emp. Fed. Credit Union v. FDIC,*
  506 F.2d 1213 (9th Cir. 1974) .............................................................. 43

*State v. Babbitt,*
  75 F.3d 449 (9th Cir. 1995) ................................................................ 15

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998) ......................................................................... 5

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ........................................................................ 8

*Texas Indus., Inc. v. Radcliff Materials, Inc.,*
  451 U.S. 630 (1981) ....................................................................... 44

*Thompson v. McCombe,*
  99 F.3d 352 (9th Cir. 1996) ................................................................. 6

*Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.,*
  594 F.2d 730 (9th Cir. 1979) ............................................................... 6

*Tobar v. United States,*
  639 F.3d 1191 (9th Cir. 2011) .............................................................. 9

*United States v. Arizona,*
  No. CV 10-1413-PHX-SRB, 2011 WL 13137062 (D. Ariz. Oct. 21, 2011) ................. 38, 41

*United States v. Bd. of Cnty. Commissioners of Cnty. of Otero,*
  843 F.3d 1208 (10th Cir. 2016) ............................................................ 36

*United States v. California,*
  436 U.S. 32 (1978) ................................................................... 3, 4, 5

*United States v. Gardner,*
  107 F.3d 1314 (9th Cir. 1997) ........................................................ 20, 21, 22

*United States v. Midwest Oil Co.,*
  236 U.S. 459 (1915) ................................................................... 18, 19

*United States v. Mitchell,*
  445 U.S. 535 (1980) ........................................................................... 9

*United States v. S. Pac. Transp. Co.,*
  543 F.2d 676 (9th Cir. 1976) ........................................................... 19

*United States v. Yakima Tribal Court,*
  806 F.2d 853 (9th Cir. 1986) ........................................................... 15

*Utah Power & Light Co. v. United States,*
  243 U.S. 389 (1917) ........................................................ 26, 28, 29, 35

*Van Brocklin v. Tennessee,*
  117 U.S. 151 (1886) ......................................................................... 28

*Von Saher v. Norton Simon Museum of Art at Pasadena,*
  592 F.3d 954 (9th Cir. 2010) ........................................................... 17

*Wash. Envtl. Council v. Bellon,*
  732 F.3d 1131 (9th Cir. 2013) ........................................................... 8

*Westbay Steel, Inc. v. United States,*
  970 F.2d 648 (9th Cir. 1992) ........................................................... 43

*Wilcox v. Jackson,*
  38 U.S. 498 (1839) ............................................................ 29, 30, 31

*Wilderness Soc'y, Inc. v. Rey,*
  622 F.3d 1251 (9th Cir. 2010) ........................................................... 8

*Wyoming v. United States,*
  279 F.3d 1214 (10th Cir. 2002) ....................................................... 32

**Statutes**

16 U.S.C. § 480 ..................................................................................... 32

16 U.S.C. § 551 ............................................................................... 22, 30

16 U.S.C. §§ 1333(a) ........................................................................... 33

28 U.S.C. § 1346(b) ............................................................................. 43

28 U.S.C. § 2401(a) ............................................................................. 17

28 U.S.C. § 2409a ............................................................................... 11

28 U.S.C. § 2409a(a) ..................................................................... 13, 14

28 U.S.C. § 2409a(d) ........................................................................... 14

28 U.S.C. § 2409a(i) ........................................................................... 12

28 U.S.C. § 2409a(m) ............................................................................ 13

28 U.S.C. §§ 2201-02 ............................................................. 10, 14, 42

43 U.S.C. § 387 .............................................................................. 22, 31

43 U.S.C. § 391 .................................................................................... 4

8 U.S.C. § 1103 .................................................................................. 46

8 U.S.C. § 1103(a)(5) ......................................................................... 45

Ariz. Const. Art. XX .................................................................. 2, 3, 22

U.S. Const. art. I ................................................................................ 39

U.S. Const. art. III ............................................................................... 8

**Rules**

Fed. R. Civ. P. 12(b)(1) ................................................................... 1, 5

Fed. R. Civ. P. 12(b)(6) ...................................................................... 7

**Regulations**

36 C.F.R. § 251.50(a) ........................................................................ 23

36 C.F.R. § 251.54 ............................................................................... 4

43 C.F.R. § 429.1 ............................................................................... 24

**Other Authorities**

*100 Years of Keeping the Trust: The Historic Role of the Judiciary in Protecting Arizona's State Land Trust*,
  44 Ariz. St. L.J. 589 (2012) ........................................................... 15

Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 ........................... 18

## MOTION

Plaintiff's October 21, 2022 Complaint, ECF No. 1, fails to identify or invoke any waiver of sovereign immunity that would allow Plaintiff to bring claims against agencies and officers of the United States; fails to establish Plaintiff's standing for some claims; and fails to state claims upon which relief can be granted.  The defects in Plaintiff's claims cannot be remedied with an Amended Complaint.  Therefore, Federal Defendants respectfully request that the Court dismiss Plaintiff's claims with prejudice under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

In accordance with LRCiv. 12.1(c), undersigned counsel certifies that Federal Defendants "notified [Plaintiff, through counsel of record,] of the issues asserted in the motion and the parties were unable to agree that the pleading was curable in any part by a permissible amendment offered by the pleading party."

## MEMORANDUM

Plaintiff Douglas A. Ducey, Governor of Arizona, asks this Court to put its judicial imprimatur on his unlawful placement of massive shipping containers on the United States' lands along the international border without the United States' permission.  On the Governor's order, Arizona's Department of Emergency and Military Affairs ("DEMA") has already constructed a barrier of "nearly 3,820 feet" of double-stacked shipping containers on U.S. Bureau of Reclamation lands near Yuma, Arizona in August 2022, well before filing this lawsuit.  Compl. ¶ 48.  The Governor then ordered DEMA to begin constructing *10 miles* of a double-stacked shipping container barrier on U.S. Forest Service lands along the international border in Cochise County, Arizona.  Compl. ¶¶ 55-56 and Ex. 5, ECF No. 1-3.  The Governor filed this lawsuit two months after he began constructing his massive shipping container barrier on federal lands without the consent of the United States.

Governor Ducey's lawsuit attempts to obtain an ex post facto ruling that his unilateral actions are lawful, but his claims have no basis in fact and law and must be dismissed.  Two of

the Governor's claims make the bald assertion that the lands on which he is placing containers are not owned by the United States, but are State lands, in contravention of the State of Arizona disclaiming all right and title to these lands in the State's Constitution as a condition of Statehood more than a century ago. *See* Ariz. Const. art. 20, § 4. The Governor's remaining four claims -- which correctly accept that the United States owns the lands -- are based on the equally untenable notion that the Governor may simply declare an emergency and then build massive structures on the United States' lands without the United States' permission and in violation of the United States' laws, in open contravention of Congress's exclusive control over those lands under the Property and Supremacy Clauses of the U.S. Constitution.

Because Governor Ducey's claims are flawed on so many fronts, they necessarily lack the foundations for cognizable judicial claims in federal court. As a result, they are variously subject to dismissal for lacking applicable waivers of sovereign immunity, lacking redressable claims for relief, presenting non-justiciable political questions, and failing to raise claims for which relief can be granted. While the issues at the international border with Mexico are difficult, trespassing on and damaging the United States' lands, violating federal law, and usurping and obstructing federal agency jurisdiction and missions, are not the solution. The Governor's case must be dismissed.

## BACKGROUND

The United States acquired the public lands comprising Arizona from Mexico through the Treaty of Guadalupe Hidalgo in 1848 (9 Stat. 922), as well as the Gadsden Purchase in 1853 (ratified by the Treaty of Mesilla in 1854, 10 Stat. 1031), which added the lands from the Gila River south to the present-day international border. *See, e.g.*, *Gila River Pima-Maricopa Indian Cmty. v. United States*, 494 F.2d 1386, 1388 (Ct. Cl. 1974). The history of the United States' ownership of these lands beginning with these treaties is well settled. For example, in *United States v. California*, 436 U.S. 32 (1978), the Court explained that "[f]ederal title . . . can be traced to the 1848 Treaty of Guadalupe Hidalgo, 9 Stat. 922, by which Mexico ceded to the

United States" the lands at issue in California. *Id.* at 34 n.3. "While the Treaty obligated the United States to respect private property rights derived from Mexican land grants, all nongranted lands previously held by the Government of Mexico passed into the federal public domain," and "[w]hen California was admitted to the Union in 1850, the United States retained ownership of these public lands." *Id.* As with California, the United States retained ownership of the public lands in Arizona as a condition of Arizona Statehood in 1912. *See* New Mexico-Arizona Enabling Act, 36 Stat. 557, 569 § 20 (June 20, 1910) (requiring that the people of Arizona "forever disclaim all right and title to the unappropriated and ungranted public lands lying within the boundaries thereof"); Ariz. Const. art. 20, § 4 ("The people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated and ungranted public lands lying within the boundaries thereof.").

While Congress opened much of the public lands in the West to private settlement and acquisition, it also allowed these lands to be withdrawn or reserved from private acquisition laws to serve the United States' interests. Thus, even before Arizona Statehood, the United States reserved the public lands where Governor Ducey is constructing shipping-container barriers: President Theodore Roosevelt established the Huachuca Forest Reserve (which subsequently became part of the Coronado National Forest) under the administration of the Forest Service by Proclamation in 1906, 34 Stat. 3255, and lands under the administration of the U.S. Bureau of Reclamation were withdrawn for the Yuma Project beginning in 1904 under the authority of the Reclamation Act of 1902, 32 Stat. 388; 43 U.S.C. § 391.

In 1907, years before Arizona statehood, President Theodore Roosevelt issued a Proclamation reserving a narrow 60-foot strip of the "public lands" along the border with Mexico "from entry, settlement or other form of appropriation under the public land laws," as a protection against the smuggling of goods into the United States. Compl. ¶ 46, Ex. 4. This so-called "Roosevelt Reservation" applied only to the "public lands" owned by the United States, not lands owned by private citizens or others. *Id.* Where these border lands had already been reserved for other purposes, such as for the Huachuca Forest Preserve, the Roosevelt

Reservation only required that the 60-foot strip be "set aside as a public reservation [to be kept free of obstruction]," but it did not remove the strip from the administrative jurisdiction of the respective land management agencies. *Id.*

More than a century later, Governor Ducey declared an alleged state of emergency to address "the conditions at the southern border," Compl. ¶ 32, and directed Arizona's Director of Emergency Management and DEMA to close gaps in the border wall between the United States and Mexico, *id.* ¶¶ 43-45. To accomplish this objective, DEMA double-stacked "multi-ton shipping containers" on Reclamation lands in the Yuma Project in the Summer of 2022. *Id.* ¶¶ 44, 48, 56. On October 13, 2022, Reclamation sent a letter advising DEMA that "[t]he unauthorized placement of those containers constitutes a violation of federal law and is a trespass against the United States [that] is harming federal lands and resources and impeding Reclamation's ability to perform its mission." Exhibit A hereto. These Reclamation lands do not fall within 60 feet of the international border or the margin of the river and, thus, are not part of the Roosevelt Reservation.

DEMA then advised the Forest Service that it also intended to construct a shipping container barrier along the international border on the Coronado National Forest. Compl. ¶ 52. The Forest Supervisor responded that DEMA would need to obtain prior approval for any such actions under "the federal regulatory approval process that governs [National Forest System] land use and occupancy." *Id.* ¶ 53, Ex. 5. The Forest Supervisor also noted that Forest Service personnel had observed unauthorized activities on National Forest System lands at the beginning of October, including the staging of more than twenty shipping containers, construction equipment, and private security personnel. *Id.* The Forest Supervisor explained that such actions had not been authorized, reiterated the process for seeking a permit under 36 C.F.R. § 251.54, and directed DEMA to "please refrain from any further activity associated with the containers on [National Forest System] lands, including the use of any equipment, until such time as a proper authorization is secured." *Id.* DEMA responded on October 7, 2022, by informing the Forest Supervisor that it would continue to place shipping containers on

ten miles of National Forest System land without seeking a permit.  *Id.* ¶ 55, Ex. 6.  To date, DEMA has constructed more than two miles of shipping container barrier on National Forest System lands without authorization from the Forest Service.

## STANDARDS OF REVIEW

### I.   MOTIONS TO DISMISS

Dismissal of a claim under Federal Rule of Civil Procedure 12(b)(1) is appropriate where the allegations in the complaint are insufficient to establish the court's jurisdiction.  "Without jurisdiction the court cannot proceed at all in any cause."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (internal quotation marks and citation omitted).  The plaintiff bears the burden of establishing subject matter jurisdiction.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.") (citations omitted).  Disputes as to material facts do not prevent the court from determining the merits of a jurisdictional claim.  *Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).  Where a plaintiff fails to establish subject matter jurisdiction, the claims must be dismissed.  *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996).

"Under Rule 12(b)(1), a defendant may challenge the plaintiff's jurisdictional allegations in one of two ways.  A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction."  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (citation omitted).  "A 'factual' attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings."  *Id.*  Federal Defendants levy a factual attack on the Governor's claims here, based on the materials attached to the Complaint and documents and facts for which the Court may take judicial notice.

Federal Rule of Civil Procedure 12(b)(6) addresses the legal sufficiency of a complaint, such that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when there are sufficient factual allegations to draw a reasonable inference that the defendants have committed the violation alleged.  While a court "must take all of the factual allegations in the complaint as true [it is] 'not bound to accept as true a legal conclusion couched as a factual allegation,'" so a "formulaic recitation of the elements of a cause of action" is not enough.  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Similarly, "conclusory allegations of law and unwarranted inferences" are also "insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996) (citation omitted).  The court also may dismiss due to "a lack of a cognizable legal theory."  *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

## II.    STANDING AND SOVEREIGN IMMUNITY

The standing doctrine arises from Article III's "cases" and "controversies" limitation on the subject matter jurisdiction of federal courts.  U.S. Const. art. III, § 2, cl. 1.  The "irreducible constitutional minimum" for standing requires: (1) a legally cognizable, concrete injury-in-fact; (2) fairly traceable to the conduct of the defendant; that (3) may be redressed by a favorable order from a court.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  The plaintiff bears the burden of establishing standing.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Standing is also not dispensed in gross: "A plaintiff must demonstrate standing for each claim [it] seeks to press and for each form of relief sought."  *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

When the government action "being challenged do[es] not require or forbid any action on the part of the [plaintiff], standing is substantially more difficult to establish."  *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1254 (9th Cir. 2010) (citing *Summers*, 555 U.S. at 493-94); *see also California v. Texas*, 141 S. Ct. 2104, 2117 (2021).  This burden includes showing that the purported injury does not "result[] from the independent action[s] of some third party not before the court."  *Allen v. Wright*, 468 U.S. 737, 757 (1984) (citation omitted); *accord*

*California v. Texas*, 141 S. Ct. at 2117 ("where a causal relation between injury and challenged action depends upon the decision of an independent third party . . . standing is not precluded, but is ordinarily substantially more difficult to establish.") (citation and internal quotation marks omitted).  Moreover, as in every case, the requested relief must be "within the district court's power to award."  *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020) (citation omitted).

"It is elementary that the United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.  A waiver of sovereign immunity cannot be implied but must be unequivocally expressed."  *Tobar v. United States*, 639 F.3d 1191, 1195 (9th Cir. 2011) (quoting *United States v. Mitchell*, 445 U.S. 535, 538 (1980)).  The party asserting a claim against the United States bears "the burden of establishing that its action falls within an unequivocally expressed waiver of sovereign immunity by Congress."  *Dunn & Black P.S. v. United States*, 492 F.3d 1084, 1088 (9th Cir. 2007) (citation omitted).  "[W]hen Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied."  *Block v. N.D. ex rel. Bd. of Univ. & School Lands*, 461 U.S. 273, 287 (1983) (citations omitted).

## ARGUMENT

Governor Ducey's October 21, 2022 Complaint brings six claims for relief.  The Governor's claims are not fit for judicial review on a number of grounds, including the Governor's inability to establish standing and applicable waivers of sovereign immunity, and the claims' failures on their face to present cognizable legal theories.

## I.   THE COMPLAINT DOES NOT PRESENT A COGNIZABLE CHALLENGE TO THE ROOSEVELT RESERVATION

Governor Ducey's First Claim for Relief seeks a declaration under 28 U.S.C. §§ 2201-02 that the 1907 Proclamation establishing the Roosevelt Reservation is unconstitutional and that

Federal Defendants should be enjoined "from attempting to exercise jurisdiction over the Roosevelt Reservation in the State." Compl. ¶ 73. This claim fails because there is no applicable waiver of the United States' sovereign immunity. But even if the United States had waived its sovereign immunity, the claim would fail for at least three additional reasons: (1) it is untimely; (2) the Roosevelt Reservation Proclamation was well within President Roosevelt's authority; and (3) even if the Proclamation was invalid, the United States would still own the lands underlying the Reservation and control their occupancy and use.

### A.   The Governor's Challenge to the Roosevelt Reservation Proclamation is Barred by Federal Sovereign Immunity.

Governor Ducey disputes the United States' title to the lands underlying the Roosevelt Reservation, claiming instead that the State owns the lands. *See id.* ¶ 4 ("the land is not federal"); *id.* ¶ 45 (claiming that the Roosevelt Reservation is "a sixty-foot-wide swath of State land"). The Governor, however, cannot invoke a waiver of the United States' sovereign immunity for this claim, and therefore it must be dismissed for lack of subject matter jurisdiction.

"The States of the Union, like all other entities, are barred by federal sovereign immunity from suing the United States in the absence of an express waiver of this immunity by Congress." *Block*, 461 U.S. at 280 (citations omitted). Congress provided a waiver of sovereign immunity for disputing the United States' ownership of real property in the Quiet Title Act ("QTA"). *Id.* at 282; *see* 28 U.S.C. § 2409a. In doing so, "Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property." *Block*, 461 U.S. at 286; *see also Alaska v. Babbitt*, 182 F.3d 672, 674 (9th Cir. 1999) (same).

Governor Ducey's challenge to the United States' title to the lands underlying the Roosevelt Reservation and his assertion that the State owns those lands is precisely the type of action that must be brought under the QTA. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 217 (2012) (noting a quiet title action "is

universally understood to refer to suits in which a plaintiff not only challenges someone else's claim, but also asserts his own right to disputed property"); *Alaska v. Babbitt*, 38 F.3d 1068, 1073 (9th Cir. 1994) ("[W]hen the United States has an interest in the disputed property, the waiver of sovereign immunity must be found, if at all, within the QTA.").  The Governor, however, does not invoke the QTA's exclusive waiver of sovereign immunity to challenge the United States' ownership of the lands underlying the Roosevelt Reservations, and such an invocation would be futile for several reasons.

First, the QTA requires states to bring suit within twelve years of receiving notice of the federal claim to lands "on which the United States . . . has made substantial improvements or substantial investments or on which the United States has conducted substantial activities pursuant to a management plan."  28 U.S.C. § 2409a(i).  Notice is provided "(1) by public communications with respect to the claimed lands which are sufficiently specific as to be reasonably calculated to put the claimant on notice of the Federal claim to the lands, or (2) by the use, occupancy, or improvement of the claimed lands which, in the circumstances, is open and notorious."  *Id.* § 2409a(k).  The QTA's statute of limitations is jurisdictional, and the Governor must allege facts showing that the twelve-year statute of limitations does not apply, but the Complaint contains no such allegations.  *See Wilkins v. United States*, 13 F.4th 791, 795 (9th Cir. 2021) ("[W]e are still bound by the conclusion in *Block*—as interpreted by many Ninth Circuit decisions—that the QTA's statute of limitations is jurisdictional.").  Given the open and notorious claim of the United States' ownership of the lands at issue, such as by reserving the National Forest System lands as part of the Coronado National Forest and administering them as such for more than a century, the Governor cannot amend his Complaint to include allegations that Arizona was not aware of the United States' claim of title for more than twelve years.  It is thus apparent, from the face of the Complaint, that any QTA statute of limitations has run.

Second, the QTA requires a State to provide notice before filing suit: "Not less than one hundred and eighty days before bringing any action under this section, a State shall notify the

head of the Federal agency with jurisdiction over the lands in question of the State's intention to file suit, the basis therefor, and a description of the lands included in the suit." 28 U.S.C. § 2409a(m). This notice requirement is jurisdictional, and the Complaint does not allege that the Governor notified the United States of Arizona's intent to challenge the United States' title to any lands. *See Ohio ex rel. Merrill v. Dep't of Nat. Res.*, No. 1:05 CV 818, 2006 WL 8459887, at *3 (N.D. Ohio Feb. 14, 2006) (finding 180-day notice requirement in § 2409a(m) to be "a mandatory jurisdictional requirement"). Without such notice from the State, a QTA claim against the United States cannot proceed.

Third, the Complaint names only federal agencies and officials and not the United States itself. But the QTA does not waive sovereign immunity for claims against federal agencies and officials because it is the United States, as the sovereign, that holds title to real property. *See* 28 U.S.C. § 2409a(a) ("The *United States* may be named as a party defendant . . . ." (emphasis added)); *id.* § 2409a(f) ("A civil action against the United States under this section shall be tried by the court without a jury."). Accordingly, the Supreme Court in *Block* noted that "the United States appears to be the only proper federal defendant under [the QTA,] 28 U.S.C. § 2409a(a)." 461 U.S. at 278 n.4. The Complaint does not name the United States as a defendant to the alleged title dispute.

Finally, the QTA requires that the Complaint "set forth with particularity the nature of the right, title, or interest which the [State] claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States." 28 U.S.C. § 2409a(d). The Complaint contains no such allegations, providing only conclusory allegations that the Roosevelt Reservation lands are "State land," Compl. ¶ 45, and that the State has "sovereignty over that land," *id.* ¶ 69. These allegations fall far short of the particularized allegations required by the QTA. *See McMaster v. United States*, 731 F.3d 881, 898 (9th Cir. 2013) (finding plaintiff failed to meet his burden to plead "sufficient facts showing all of the circumstances under which his title to the structures was acquired"). The Governor cannot

remedy this pleading defect because there is no colorable basis for the State to claim title to the lands at issue.

The Complaint references the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02 in support of this claim, but "[a] claim under the Declaratory Judgment Act may not be used as an end run around the QTA's limited waiver of sovereign immunity." *Alaska Dep't of Nat. Res. v. United States*, 816 F.3d 580, 586 (9th Cir. 2016) (citing *McMaster*, 731 F.3d at 900); *see also Block*, 461 U.S. at 278, 286 (finding QTA exclusive waiver of sovereign immunity where plaintiff asserted jurisdiction under the Declaratory Judgment Act).

With no available waiver of sovereign immunity under the QTA or the Declaratory Judgment Act, Governor Ducey attempts to establish a waiver of the United States' sovereign immunity by asserting that the named federal agencies and officials acted "*ultra vires*." Compl. ¶ 69. Although at times there may be an "*ultra vires* exception to sovereign immunity of federal officials," *United States v. Yakima Tribal Court*, 806 F.2d 853, 859 (9th Cir. 1986), no such exception applies here. *Block* explained that before passage of the QTA, some claimants brought "the so-called 'officer's suit,'" in which "the claimant would proceed against the federal officials charged with supervision of the disputed area, rather than against the United States." 461 U.S. at 281. "[S]uits alleging 'ultra vires' acts, actions that are outside the scope of a government officer's authority or are unconstitutional, are a subgroup of officer's suits as a whole." *State v. Babbitt*, 75 F.3d 449, 452 (9th Cir. 1995). Regardless of whether such suits were allowed before passage of the QTA, "the *Block* court 'applied the rule that a precisely drawn, detailed statute pre-empts more general remedies,' in finding that the QTA dictated the exclusive means by which a challenge to the United States' title to land could be brought." *Id.* at 452-53 (quoting *Block*, 461 U.S. at 285). Because Governor Ducey challenges the United States' title to the lands, "officer's suits, including 'ultra vires' suits," cannot be used to divest the United States' sovereign immunity. *Id.* at 453; *see also Alaska*, 182 F.3d at 674-75 ("The *ultra vires* argument has to be rejected in this case because it would be no more than the old officers' suit in new words.").

In short, the United States has not waived its sovereign immunity for Governor Ducey's challenge to its ownership of the lands underlying the Roosevelt Reservation and this claim should be dismissed for lack of subject matter jurisdiction.  *See McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988) (noting sovereign immunity is "a question of subject matter jurisdiction.").

## B.  Even with a Waiver of Sovereign Immunity, a Claim Challenging the Roosevelt Reservation Proclamation Would Fail.

Even if Governor Ducey's challenge to the United States' title to the lands was not subject to the QTA's exclusive waiver of sovereign immunity, it would be time-barred and otherwise fail because the Roosevelt Reservation Proclamation was, on its face, a lawful exercise of presidential authority.  And, even if the Proclamation was set aside, such relief would not redress the Governor's alleged injuries because the United States would still own and control the lands underlying the Reservation.

### 1.  The statute of limitations bars any challenge to the Roosevelt Reservation Proclamation.

Any claim challenging the Roosevelt Reservation Proclamation outside the QTA would be subject to the six-year statute of limitations found at 28 U.S.C. § 2401(a), which provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."  *See Nesovic v. United States*, 71 F.3d 776, 778 (9th Cir. 1995) (noting that § 2401(a) is a "catchall statute of limitations" that "applies to all civil actions whether legal, equitable or mixed.") (quotation omitted).  A claim must be dismissed under Rule 12(b)(6) where "the running of the statute [of limitations] is apparent on the face of the complaint."  *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (quotation omitted).

President Roosevelt issued the Roosevelt Reservation Proclamation on May 27, 1907.  35 Stat. 2136 (May 27, 1907).  Arizona became a state five years later.  37 Stat. 1728 (Feb. 14, 1912).  More than one hundred years then passed before Governor Ducey brought this action.  Because the Governor challenges no allegedly adverse action against the State other than the

1907 reservation of lands from disposal under the federal public land laws, the Governor's attempt to challenge the Proclamation and the exercise of federal jurisdiction over the underlying lands is more than a century too late.  On the face of the Complaint, any challenge to the Proclamation would plainly be barred by the statute of limitations.

### 2. The Roosevelt Reservation Proclamation was a valid exercise of executive authority on its face as a matter of law.

Even if Governor Ducey could overcome the lack of a waiver of federal sovereign immunity and the untimeliness of his challenge to the Roosevelt Reservation, his claim that the Proclamation was unconstitutional is simply wrong on its face under controlling Supreme Court precedent.  *See* Compl. ¶¶ 66-68 (claiming Proclamation exceeded executive authority under the U.S. Constitution).  The Proclamation declared that it was "necessary for the public welfare that a strip of land lying along the boundary line between the United States and the Republic of Mexico be reserved from the operation of public land laws and kept free from obstruction" to protect against the smuggling of goods between Mexico and the United States.  35 Stat. 2136. To do this, the President

> reserved from entry, settlement or other form of appropriation under the public land laws and set apart as a public reservation, all public lands within sixty feet of the international boundary between the United States and the Republic of Mexico, within the State of California and the Territories of Arizona and New Mexico.

*Id.*  By its terms, the Proclamation applied only to public lands (i.e., those lands owned by the United States), not lands owned by private citizens.  *Id.*

This reservation of public land reflects a "long-continued practice" by which Presidents "made a multitude of Executive orders which operated to withdraw public land that would otherwise have been open to private acquisition."  *United States v. Midwest Oil Co.*, 236 U.S. 459, 469 (1915).  As the Supreme Court in *Midwest Oil* explained, "when it appeared that the public interest would be served by withdrawing or reserving parts of the public domain, nothing was more natural than to retain what the government already owned."  *Id.* at 471.  This is precisely what the Roosevelt Reservation

Proclamation did by finding that the "public welfare" would be served by reserving certain "public lands" from operation of the "public land laws," which, without the reservation, would have potentially opened them to private acquisition.  35 Stat. 2136.

The Roosevelt Reservation Proclamation is lawful for the same reasons as the withdrawal order at issue in *Midwest Oil Co.*:

> The Executive, as agent, was in charge of the public domain; by a multitude of orders extending over a long period of time, and affecting vast bodies of land, in many states and territories, he withdrew large areas in the public interest.  These orders were known to Congress, as principal, and in not a single instance was the act of the agent disapproved.  Its acquiescence all the more readily operated as an implied grant of power in view of the fact that its exercise was not only useful to the public, but did not interfere with any vested right of the citizen.

*Id.* at 475; *see also Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 854-55 (9th Cir. 2017) (explaining Congress's "implied grant of power" for the executive branch to withdraw federal lands from federal laws allowing private acquisition); *United States v. S. Pac. Transp. Co.*, 543 F.2d 676, 686 (9th Cir. 1976) ("The Supreme Court has held that Congress delegated to the President the power to reserve public lands from disposition under the public land laws for Indians *or for other purposes* by long-continued acquiescence in the exercise of that power." (emphasis added; citations omitted)).

In short, Governor Ducey has not established a valid waiver of sovereign immunity or shown from the face of the Complaint that this claim is timely under any waiver of sovereign immunity.  And, even if the claim were timely, it would fail to state a claim for which relief can be granted because the Roosevelt Reservation Proclamation was, as a matter of settled law, within the authority of President Roosevelt to issue in 1907.

### 3.  The Roosevelt Reservation Proclamation did not divest land from State ownership.

Even if a claim challenging the validity of the Roosevelt Reservation were properly before the Court, and even if the Proclamation were invalid, the Complaint would still fail to state a redressable claim for declaratory and injunctive relief.  Setting aside the Proclamation

1    would have no effect on the United States' ownership, authority, and control of the lands

2    underlying the Roosevelt Reservation.  Governor Ducey's claim to the contrary misunderstands

3    the Roosevelt Reservation and basic tenets of federal property law.

4          The Complaint alleges that the Roosevelt Reservation "secure[d] land or property," and

5    that the exercise of jurisdiction over that land or property by the Forest Service and

6    Reclamation "conflicts with the State's sovereignty over that land."  Compl. ¶ 67, 69.

7    Although not a model of clarity, these allegations suggest that the Governor is claiming that the

8    Proclamation somehow divested lands from State ownership.  It did not.

9          First, Arizona did not become a state until 1912, five years after the Roosevelt

10   Reservation was established.  Thus, the Proclamation could not have divested the State of lands

11   over which it was sovereign because the State did not exist.  *See, e.g.*, *United States v. Gardner*,

12   107 F.3d 1314, 1318 (9th Cir. 1997) (noting Nevada "had no independent claim to sovereignty"

13   before becoming a state).  Because Arizona was a Territory in 1907, the "public lands"

14   addressed in the Proclamation could only have been lands owned by the United States.

15         Moreover, upon becoming a State, Arizona did not assume title to all unappropriated

16   public lands.  Because the United States owned all public lands in the Territory before

17   Statehood, Congress had the power "to dispose of and make all needful Rules and Regulations

18   respecting the Territory or other Property belonging to the United States."  U.S. Const. art. IV,

19   § 3, cl. 2.  This Property Clause power "is virtually unlimited," *Gardner*, 107 F.3d at 1320, and

20   Congress exercised that power in the New Mexico-Arizona Enabling Act of 1910, which

21   resulted in Arizona statehood in 1912, *see* 36 Stat. 557 (1910) (Enabling Act); 37 Stat. 1728

22   (1912) (presidential proclamation admitting Arizona as a State).  In so doing, Congress granted

23   Arizona ownership of more than ten million acres.  *See* Hogan & Herr-Cardillo, *100 Years of*

24   *Keeping the Trust: The Historic Role of the Judiciary in Protecting Arizona's State Land Trust*,

25   44 Ariz. St. L.J. 589, 590 (2012).  The State also assumed title to certain lands beneath

26   navigable waters under the equal-footing doctrine.  *See Bonelli Cattle Co. v. Arizona*, 414 U.S.

27   313, 319 (1973) ("When Arizona achieved statehood in 1912, it assumed title to the land

28   FEDERAL DEFENDANTS' MOTION TO DISMISS                                                    15

beneath the stream of the Colorado River, by virtue of the equal-footing doctrine."), *overruled on other grounds by Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363 (1977).

The rest of the unappropriated public lands, however, including previously reserved lands such as the National Forest System and Reclamation lands, remained the property of the United States.  *See Alaska v. United States*, 545 U.S. 75, 100 (2005) ("It is now settled that the United States can defeat a future State's presumed title to submerged lands not only by conveyance to third parties but also by setting submerged lands aside as part of a federal reservation, such as a wildlife refuge.") (quotation omitted).  Indeed, the Enabling Act reflected as much by declaring "[t]hat the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title to the unappropriated and ungranted public lands lying within the boundaries thereof."  36 Stat. 557, 569 (1910); *see Gardner*, 107 F.3d at 1320 (noting similar disclaimer for Nevada "was merely a recognition of the preexisting United States title").  Arizona ratified the retention of public lands by the United States, disclaiming all right and title to federal lands in adopting the State Constitution in 1912.  *See* Ariz. Const. art. 20, § 4.

As a result, even if the reservation of public lands from application of the public land laws by the Proclamation was somehow invalid, the lands would still be owned by the United States and subject to Congress's absolute powers under the Property Clause.  In the exercise of those powers, Congress has authorized Reclamation and the Forest Service to control the occupancy and use of the lands in dispute.  *See* 43 U.S.C. § 387 (Reclamation); 16 U.S.C. § 551 (Forest Service); *see also Gardner*, 107 F.3d at 1318 ("[U]nder the Property Clause, the United States can administer its federal lands any way it chooses, including the establishment of a national forest reserve.").  In light of this authorization, the Forest Service and Reclamation have jurisdiction over the use and occupancy of these lands, and the Complaint fails to state a claim for relief or one that is redressable for purposes of establishing standing.  The Governor's first claim for relief thus must be dismissed.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II.   FEDERAL DEFENDANTS DID NOT, AND COULD NOT, DIVEST THEMSELVES OF JURISDICTION OVER FEDERAL LANDS THROUGH THE 2006 MEMORANDUM OF UNDERSTANDING

The Second Claim for Relief alleges that Federal Defendants are bound by an internal interagency Memorandum of Understating ("MOU") dated March 31, 2006, that Governor Ducey interprets as disclaiming or relinquishing Federal Defendants' jurisdiction over the Roosevelt Reservation.  Compl. ¶¶ 74-81.  This claim is flawed jurisdictionally, and it also fails to state a claim on its face.

First, Governor Ducey lacks standing to enforce the 2006 MOU.  The MOU was entered into by the Department of Homeland Security ("DHS"), Department of the Interior, and Department of Agriculture.  The State is not a party.  Because the MOU "is an intra-governmental agreement among the [federal] Parties and does not create or confer any rights, privileges, or benefits upon any person, party, or entity," ECF No. 1-3, Ex. 7 at 9 (¶ V.F), the Governor lacks standing to enforce it.  Moreover, the MOU is not binding on Federal Defendants, but only expresses the federal agencies' intentions "to provide consistent goals, principles, and guidance related to border security," relating to operations and activities by DHS's U.S. Customs and Border Patrol ("CBP") on the United States' lands under the management authority of Federal Defendants and other federal agencies in the international border areas with both Mexico and Canada.  *Id.* at 1-2 (¶ I.C).  The MOU expressly adds that it "is not and shall not be construed as a rule or regulation."  *Id.* at 9 (¶ V.F).  As a result, the MOU is neither binding nor enforceable, and the Governor lacks standing for such a claim. *See, e.g.*, *Idaho Sporting Cong., Inc. v. U.S. Forest Serv.*, 92 F.3d 922, 927 (9th Cir. 1996) (holding that the plaintiff lacked standing to assert violations of a memorandum of agreement among federal agencies that included similar disclaimers).

Even if this Court had jurisdiction to enforce the MOU, the MOU does not support Governor Ducey's request for a judicial declaration that "neither the Forest Service nor [Reclamation] have jurisdiction over the areas of the Roosevelt Reservation in the State over

which they have respectively claimed jurisdiction."  Compl. ¶ 81.  The Governor bases this claim for relief on the provision of the MOU which states that the federal agencies

> acknowledge that CBP operation and construction within the sixty-foot 'Roosevelt Reservation' of May 27, 1907 (along the US-Mexico border) . . . is consistent with the purpose of those reservations and that any CBP activity (including, but not limited to, operations and construction) within the sixty-foot reservation[] is outside the oversight or control of Federal land managers.

*Id.* ¶ 75 (quoting ECF No. 1-3, Ex. 7 at 2 (¶ I.E)).  This statement is a far cry from Federal Defendants disclaiming or relinquishing their jurisdiction over these areas.[1]

The statement expressly applies only to "CBP activity" in the sixty-foot corridor immediately adjacent to the international border.  *Id.*  Given the primacy that Congress has placed on the importance of CBP's mission in securing the international border, it is unremarkable for Federal Defendants to defer to CBP's activity on the United States' property immediately adjacent to the border with Mexico.  *See, e.g.*, Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 § 102(a) (codified *as amended* at 8 U.S.C. § 1103 note) (giving DHS authority "to install additional physical barriers and roads . . . in the vicinity of the United States border").  But while indicating that the federal agencies would forego "oversight and control" of "CBP activity" within the Roosevelt Reservation, the MOU says nothing about the agencies declining to conduct "oversight and control" of any other person or entity, even those purporting to be acting in the interest of border security.  On the contrary, the MOU recognizes that Federal Defendants "are statutorily charged as managers of Federal lands," including "in the vicinity of international borders" and, therefore, "will work cooperatively with CBP" to, among other things, "more effectively protect national security."  ECF No. 1-3, Ex. 7 at 1-2 (¶¶ II.B, II.C); *see also id.* at 3 (¶ III.B) ("The Parties recognize that DOI and USDA have responsibility for

---

[1] By analogy to property law, the MOU at most grants what is effectively an easement to CBP.  But the grant of an easement does not constitute a relinquishment of authority to other users (like the Governor here) by the owner of the servient estate.

FEDERAL DEFENDANTS' MOTION TO DISMISS                                                    18

enforcing Federal laws relating to land management, resource protection, and other such functions on Federal lands under their jurisdiction.").  Accordingly, in recognition of Federal Defendants' duty to manage and protect the federal lands within the boundaries of the lands under their administration, the MOU stresses that "[n]othing in this MOU will be construed as affecting the authority of the Parties in carrying out their statutory responsibilities."  *Id.* at 9 (¶ V.B).

In accordance with their charges from Congress to regulate the use and occupancy of these lands, Federal Defendants would have reviewed Governor Ducey's applications for use. In so doing, Federal Defendants would have conferred with DHS in accordance with the MOU to determine whether the Governor's proposals to place shipping containers both within and outside the Roosevelt Reservation[2] would impact CBP's national security operations and would otherwise comply with federal law.  By failing to obtain the requisite permissions from Federal Defendants, the Governor is placing shipping containers in trespass on lands of the United States administered by Federal Defendants.

Governor Ducey lacks standing because the State is not a party to the MOU and because the MOU is not binding or judicially enforceable.  And, even if it were, the Governor fails to state a claim because the MOU, on its face, does not grant any rights to the Governor, enforceable or otherwise, and does not disclaim or divest Federal Defendants of their jurisdiction over any Roosevelt Reservation areas within the boundaries of the lands they are charged with administering.

---

[2] As Governor Ducey acknowledges, much of the Governor's project is not in the Roosevelt Reservation.  *See, e.g.*, Compl. ¶ 45 (acknowledging that only "parts" of his border barrier are located in the Roosevelt Reservation); *id.* ¶ 55 (recognizing that the ten-mile gap that the Governor intends to fill on National Forest System lands only "*includes* land within the Roosevelt Reservation") (emphasis added).  Thus, even if his MOU claim were cognizable and meritorious, the Governor would still be in trespass on the United States' lands for activities *outside* of the Roosevelt Reservation by failing to obtain permission from Federal Defendants and for activities *inside* the Roosevelt Reservation by failing to obtain permission from CBP, which he has not obtained.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III. ANY "CONCURRENT JURISDICTION" THAT ARIZONA MAY HAVE ON FEDERAL LANDS DOES NOT GIVE GOVERNOR DUCEY AUTHORITY TO OCCUPY AND USE THE PROPERTY OF THE UNITED STATES

Governor Ducey's Third Claim for Relief alleges that "the State and the federal government have concurrent jurisdiction over the Roosevelt Reservation." Compl. ¶ 84.[3] This claim fails on its face as a matter of law. Federal Defendants do not dispute that Arizona retains some criminal and civil jurisdiction over the United States' lands within the Roosevelt Reservation in the State. But a declaration saying so would not redress the Governor's alleged injuries because, whatever jurisdiction the State retains, the Governor still may not occupy and use federal lands without the United States' permission. The Supreme Court has repeatedly explained that while "for many purposes a state has civil and criminal jurisdiction over lands within its limits belonging to the United States," these powers "do[] not extend to any matter that is not consistent with full power in the United States to protect its lands, to control their use, and to prescribe in what manner others may [obtain] rights in them." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 404 (1917).

### A. Under The Property and Supremacy Clauses, States May Not Occupy and Use Federal Lands without the Consent of Congress.

The Property Clause of the U.S. Constitution provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. The United States holds federal public land "as trustee for the people of the United States" and is entitled to "maintain its possession and to prosecute trespassers." *Camfield v. United States*, 167 U.S. 518, 524 (1897). Under the Property Clause, Congress enjoys exclusive and absolute power to

---

[3] "Concurrent jurisdiction" is a term of art under the Enclave Clause, U.S. Cont. art. 1, § 8, cl. 17, that does not apply to federal public lands administered under the Property Clause. It is not clear if the Governor is using this phrase as a term of art or inartfully applying it to describe Arizona's retained jurisdiction over the federal public lands at issue here.

enact legislation pertaining to federal public lands administered by federal land management agencies. *Alabama v. Texas*, 347 U.S. 272, 273 (1954) (per curiam).

Under the Property Clause, "[t]he United States can prohibit absolutely or fix the terms on which its property may be used." *Light v. United States*, 220 U.S. 523, 536 (1911). "These are rights incident to proprietorship, to say nothing of the power of the United States as a sovereign over the property belonging to it." *Id.* at 537. More to the point, "the government is charged with the duty and clothed with the power to protect the public domain from trespass and unlawful appropriation." *Id.* at 536 (quotation omitted); *see also, e.g.*, *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 581 (1987) (holding that "the Property Clause gives Congress plenary power to legislate the use of . . . federal land").[4]

The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art VI, cl. 2. In conjunction, the Supremacy Clause and Property Clause dictate that any State laws or actions that conflict with Congress's exercise of its authority over federal public lands—such as Governor Ducey's actions here—must yield. The Supreme Court has often stressed that a State has no authority to interfere with the use and disposal of federal public lands. For instance, in *Van Brocklin v. Tennessee*, 117 U.S. 151 (1886), the Supreme Court held that, under the Property Clause, Congress "has the exclusive right to control and dispose of" all "public and unoccupied lands, to which the United States have acquired title," and that "no state can interfere with this right, or embarrass its exercise." *Id.* at 168 (citations omitted).

In the seminal *Utah Power* case, the States and State agencies claimed that they could occupy and use federal public lands without obtaining permission from the federal agencies managing those public lands. 243 U.S. at 402-03. The State parties argued that "their claims

---

[4] "Plenary" means "[f]ull, entire, complete, absolute, perfect, unqualified." Black's Law Dictionary, p. 1154 (6th. Ed. 1990).

must be tested by the laws of the state in which the lands are situate[d] rather than by the legislation of Congress" and that federal public lands "are subject to the jurisdiction, powers, and laws of the state in the same way and to the same extent as are similar lands of others." *Id.* at 403-04.  The Supreme Court squarely rejected the State parties' arguments:

> Not only does the Constitution (art. 4, § 3, cl. 2) commit to Congress the power 'to dispose of and make all needful rules and regulations respecting' the lands of the United States, but the settled course of legislation, congressional and state, and repeated decisions of this court, have gone upon the theory that *the power of Congress is exclusive*, and that only through its exercise in some form can rights in lands belonging to the United States be acquired.

*Id.* at 404 (emphasis added).  As noted above, the Court recognized that a State may have concurrent civil and criminal jurisdiction over the United States' lands, but that jurisdiction "does not extend to any matter that is not consistent with full power in the United States to protect its lands, to control their use, and to prescribe in what manner others may [obtain] rights in them." *Id.*  Thus, while a State may punish public offenses and tax activities on federal lands, a State may not "invest others with any right whatever in them." *Id.* (citations omitted).

As explained in *Utah Power*, Governor Ducey has no power to occupy and use federal lands—such as those within the Coronado National Forest or the Yuma Project (whether underlying the Roosevelt Reservation or not)—without the United States' permission.  The Supreme Court established long ago that a State cannot "take from the United States their own land, against their own will, and against their own laws." *Wilcox v. Jackson*, 38 U.S. 498, 517 (1839).  The Property Clause vests the power over the occupancy and use of federal public lands solely in Congress, and the Supremacy Clause bars the Governor from usurping that power, as he is attempting to do here.

### B.   Governor Ducey's Unauthorized Actions on the Lands of the United States Directly Conflict with Numerous Federal Laws.

The Supremacy Clause bars State actions that interfere with or that conflict with the laws of Congress.  In addition to Governor Ducey's unconstitutional attempt to divest the United States of a paramount power granted exclusively to Congress under the Property Clause,

then, the Governor's actions cannot stand under the Supremacy Clause because they directly conflict with Congress's exercise of its Property Clause power over the federal lands at issue.

For National Forest System lands, Congress directed the Secretary of Agriculture to make rules and regulations governing "their occupancy and use and to preserve the forests thereon from destruction." 16 U.S.C. § 551. In accordance with its mandate to protect National Forests and to "regulate their occupancy and use," *id.*, the Department of Agriculture has promulgated regulations governing National Forest System lands. Under these regulations, with exceptions not applicable here, "[a]ll uses of National Forest System lands, improvements, and resources" are designated "special uses," and "[b]efore conducting a special use, individuals or entities must submit a proposal to the authorized officer and must obtain a special use authorization from the authorized officer." 36 C.F.R. § 251.50(a). Without a special use authorization or other applicable permission, Forest Service regulations prohibit, among other things:

- "Use or occupancy of National Forest System land or facilities," *id.* § 261.10(k);

- "Constructing, placing, or maintaining any kind of road, trail, structure, fence, enclosure, communication equipment, significant surface disturbance, or other improvement on National Forest System lands or facilities," *id.* § 261.10(a);

- "Placing a vehicle or other object in such a manner that it is an impediment or hazard to the safety or convenience of any person," *id.* § 261.10(f);

- "Damaging and leaving in a damaged condition any such road, trail, or segment thereof," *id.* § 261.12(c);

- "Blocking, restricting, or otherwise interfering with the use of a road, trail, or gate," *id.* § 261.12(d);

- "Cutting or otherwise damaging any timber, tree, or other forest product, except as authorized by a special-use authorization, timber sale contract, or Federal law or regulation," *id.* § 261.6(a); and

- Damaging or removing "any natural feature or other property of the United States," *id.* § 261.9(a)-(b).

As with National Forest System lands, Congress has also tasked Reclamation with protecting federal lands under its authority by regulating the occupancy and use of those lands.

43 U.S.C. § 387.  But in exercising this discretion, Congress expressly charged Reclamation with protecting the United States' interests:

> Such permits or grants shall be made only when, *in the judgment of the Secretary*, their exercise will not be incompatible with the purposes for which the lands or interests in lands are being administered, and shall be on such terms and conditions as in his judgment will adequately protect the interests of the United States and the project for which said lands or interests in lands are being administered.

*Id.* (emphasis added).

For projects like the Governor's, Reclamation also has promulgated regulations requiring written authorization from the agency.  43 C.F.R. § 429.1; *see also id.* § 429.3 ("Possession or occupancy of . . . Reclamation land, facilities, or waterbodies [including through the construction of linear infrastructure] require a use authorization in accordance with this part.").  In reviewing an application for an occupancy and use authorization, "Reclamation will consider . . . (a) Compatibility with authorized project purposes, project operations, safety, and security; (b) Environmental compliance; (c) Compatibility with public interests; (d) Conflicts with Federal policies and initiatives; (e) Public health and safety; (f) Availability of other reasonable alternatives; and (g) Best interests of the United States."  *Id.* § 429.14.  Without such an authorization, Reclamation's regulations prohibit trespassing "on Reclamation facilities, lands, and waterbodies," *id.* § 429.33(g), which includes "[u]nauthorized possession or occupancy of Reclamation facilities, lands, or waterbodies," and "[u]nauthorized dumping or abandonment of personal property on Reclamation facilities, lands, or waterbodies."  *Id.* § 423.24.

By sidestepping Federal Defendants' approval processes and proceeding to occupy and use the United States' lands without authorization, Governor Ducey stands in conflict with federal law.  Indeed, by trespassing and disturbing federal public lands without authorization, the Governor and his agents are not only acting in conflict with federal law but are *violating* many or all the provisions listed above, as well as many other federal laws and regulations applicable to such activities.  The Governor's actions are unlawful and cannot stand.

1

2

### C.   Arizona's "Concurrent Jurisdiction" Does Not Convey a Right for Governor Ducey to Occupy and Use Federal Lands and Must Yield to the United States' Plenary Authority over These Lands.

3

4

5

6

7

8

9

10

11

The United States does not claim exclusive jurisdiction over the National Forest System and Reclamation lands at issue, but Arizona's jurisdiction is limited to enforcing its criminal and civil laws on those lands within its borders.  *Wyoming v. United States*, 279 F.3d 1214, 1226 (10th Cir. 2002); 16 U.S.C. § 480 (State retains civil and criminal jurisdiction on National Forest System lands).  That limited jurisdiction does not give Arizona a property right to occupy, use, and build structures on the lands owned by the United States.  And, even if it did, "where those state laws conflict with . . . legislation passed pursuant to the Property Clause, the law is clear: The state laws must recede."  *Kleppe v. New Mexico*, 426 U.S. 529, 543 (1976) (citation omitted).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The Supreme Court in *Kleppe* directly rejected the Governor's "concurrent jurisdiction" argument.  At issue there was the constitutionality of two conflicting statutes, the federal Wild Free-Roaming Horses and Burros Act ("Wild Horses Act") and the New Mexico Estray Law.  Congress enacted the Wild Horses Act to "protect 'all unbranded and unclaimed horses and burros on public lands of the United States' from 'capture, branding, harassment, or death.'" 426 U.S. at 531 (quoting 16 U.S.C. §§ 1331, 1332(b)).  The Act directed the Secretary of the Interior and the Secretary of Agriculture through the Forest Service "'to protect and manage (the animals) as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands.'"  *Id.* at 531-32 (quoting 16 U.S.C. §§ 1333(a)).  The New Mexico Livestock Board asserted that the federal government lacked power to control wild horses and burros on the public lands of the United States and that, under the New Mexico Estray Law, the State had authority to take possession of horses and burros on State and federal land.  *Id.* at 533.  Based on the authority of the New Mexico Estray Law, the Livestock Board rounded up and removed wild burros on public lands of the United States.  *Id.* at 533-34.

27

28

When the United States demanded that the Livestock Board recover the animals and return them to public lands, the State of New Mexico and the Livestock Board filed an action seeking a declaration that the Wild Horses Act was unconstitutional. *Id.* at 534. The Court held that the Wild Horses Act was constitutional under the Property Clause, *id.* at 546, and that the State's attempt to authorize an activity forbidden under the Wild Horses Act was barred by the Supremacy Clause. *Id.* at 543. Rejecting the State's jurisdiction argument, the Supreme Court explained:

> Absent consent or cession a State undoubtedly retains jurisdiction over federal lands within its territory, but Congress equally surely retains the power to enact legislation respecting those lands pursuant to the Property Clause. And when Congress so acts, the federal legislation necessarily overrides conflicting state laws under the Supremacy Clause. As we said in [*Camfield*], in response to a somewhat different claim: 'A different rule would place the public domain of the United States completely at the mercy of state legislation.'

*Id.* (citations omitted; quoting *Camfield*, 167 U.S. at 526).[5] The Supreme Court reached this ruling despite recognizing that "the States have broad trustee and police powers over wild animals within their jurisdictions." *Id.* at 545 (citations omitted).

As in *Kleppe*, while Arizona may exercise some jurisdiction over federal public lands in the State, that jurisdiction "must recede" where it conflicts with federal laws governing management of those lands. *Id.* at 543. Even if they did not facially violate the United States' power under the Property Clause, Governor Ducey's actions in entering and using National Forest System and Reclamation lands to construct miles of barriers out of shipping containers while damaging trees, drainages, roads, and other property of the United States without Forest Service and Reclamation authorization conflicts with and violates federal law. As noted above,

---

[5] "Federal regulations have the same preemptive effect as federal statutes." *Lazar v. Kroncke*, 862 F.3d 1186, 1195 (9th Cir. 2017) (citing *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)); *see also City of New York v. F.C.C.*, 486 U.S. 57, 63 (1988) ("The phrase 'Laws of the United States' [in the Supremacy Clause] encompasses both federal statutes themselves and federal regulations that are properly adopted in accordance with statutory authorization.").

the Supreme Court has declared that "the power of Congress is exclusive, and . . . only through its exercise in some form can rights in lands belonging to the United States be acquired," and States cannot "invest others with any right whatever" in federal lands.  *Utah Power*, 243 U.S. at 404; *see also id.* at 410 (holding that States and their agents were "mistaken" in "the theory that the [congressional] act and all the regulations are without application to their situation" and were thus improperly "occupying and using reserved lands of the United States without its permission and contrary to its laws").  The Tenth Circuit rejected a similar attempt by the State of New Mexico and Otero County to occupy and use National Forest System lands without Forest Service authorization to cut trees that they asserted were posing a nuisance, and imminent life- and property-threatening emergencies to their residents.  *United States v. Bd. of Cnty. Commissioners of Cnty. of Otero*, 843 F.3d 1208 (10th Cir. 2016).  "Although state and local governments can ordinarily exercise their police powers over federal land within their boundaries, those powers must yield under the Supremacy Clause when they conflict with federal law under the Property Clause." *Id.* at 1212.

In short, absent the consent of Congress to occupy and use the lands of the United States, Arizona's claim to "concurrent jurisdiction" does not give Governor Ducey authority to construct a shipping container border barrier on National Forest System and Reclamation lands, inside or outside the Roosevelt Reservation.  The relief requested thus would not redress the Governor's alleged injuries for standing purposes.  And because the project directly conflicts with—and violates—numerous federal laws and regulations governing the occupancy and use of these lands, the Governor's action is preempted and cannot stand under the Supremacy Clause, and thus also fails to state a claim for which relief can be granted.

## IV.   THE GOVERNOR'S CONSTITUTIONAL "INVASION CLAUSE" AND "SELF-DEFENSE CLAUSE" CLAIMS PRESENT NONJUSTICIABLE POLITICAL QUESTIONS

The Fourth Claim for Relief fares no better.  This claim alleges that Article IV, Section 4's "Invasion Clause" and Article I, Section 10's "Self-Defense Clause" allow the State

to bypass federal laws to respond to what the Governor terms "overwhelming emergency crises at the border." Compl. ¶¶ 90-91. The Governor is wrong for at least three reasons. First, the Ninth Circuit has held that claims under the Invasion Clause present nonjusticiable political questions. *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997); *see also Arizona v. United States*, 104 F.3d 1095, 1096 (9th Cir. 1997) (affirming dismissal for the reasons in *California*). Second, the Invasion and Self-Defense Clauses only provide the State with authority to "engage in War" in response to an invasion by a hostile political entity, not to build a barrier on federal land in response to immigration. *See California*, 10 F.3d at 1091. Third, the Governor's desire to erect a barrier must yield to the federal government's absolute authority over federal lands under the Property and Supremacy Clauses, as discussed above. *See also Arizona v. United States*, 567 U.S. 387, 399-400 (2012).

Article IV, Section 4 of the Constitution says that "[t]he United States . . . shall protect each [state] against Invasion." Article I, Section 10, clause 3 provides that "[n]o state shall, without the Consent of Congress . . . engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." These clauses show the founders' intent to vest supreme power over foreign relations—including the war power—in the federal government, with a limited power reserved to states to "engage in War" if "actually invaded" by a hostile foreign power. *See Hines v. Davidowitz*, 312 U.S. 52, 62 (1941) ("That the supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution was pointed out by authors of The Federalist in 1787, and has since been given continuous recognition by this Court."); 3 J. Story, COMMENTARIES ON THE CONSTITUTION § 1172 (1833) ("The power to declare war is exclusive in congress; and . . . the states are prohibited from engaging in it, unless in cases of actual invasion or imminent danger thereof.").

The Invasion Clause does not authorize the Governor's unlawful actions on the border. Indeed, the Ninth Circuit has rejected claims by Arizona that the federal government breaches its obligations under the Invasion Clause by failing to prevent migrants from entering the State.

*Arizona*, 104 F.3d at 1096; *California*, 104 F.3d at 1090-91; *see also United States v. Arizona*, No. CV 10-1413-PHX-SRB, 2011 WL 13137062, at *5 (D. Ariz. Oct. 21, 2011) ("This Court is bound by Ninth Circuit precedent.  Arizona's Invasion Clause claim is a nonjusticiable political question and is therefore dismissed.").  Claims under the Invasion Clause present nonjusticiable political questions, the Ninth Circuit explained, because they "implicate[] foreign policy concerns which have been constitutionally committed to the political branches." *California*, 104 F.3d at 1091; *see also id.* ("even if the issue were properly within the Court's constitutional responsibility, there are no manageable standards to ascertain whether or when an influx of illegal immigrants should be said to constitute an invasion.").  Other circuits agree.  *See Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995); *New Jersey v. United States*, 91 F.3d 463, 470 (3rd Cir. 1996).

The Ninth Circuit also has held in the alternative that the Invasion Clause "was not intended to be used as urged by [Arizona]," but affords protection only "in situations wherein a state is exposed to armed hostility from another political entity." *California*, 104 F.3d at 1091; *accord* The Federalist No. 43 at 293 (James Madison) (Cooke ed. 1961) (stating that the reason for the Invasion Clause is to protect the States from "foreign hostility" and from "ambitious or vindictive enterprises" on the part of other States or foreign powers); *Padavan*, 82 F.3d at 28 ("Clearly, New York State is not being subjected to the sort of hostility contemplated by the Framers"—namely, "armed hostility from another political entity, such as another state or foreign country that is intending to overthrow the state's government."); *New Jersey*, 91 F.3d at 468 (same).  So even if reviewable, the Governor's allegations do not state a claim.

The Self-Defense Clause likewise cannot justify Governor Ducey's actions.  The Self-Defense Clause provides that the several states may "engage in War" if faced with actual or imminent invasion.  U.S. Const. art. I, § 10, cl. 3.  The term "engage in War" refers to hostilities between sovereigns; it does not empower the Governor to do as he pleases on federal land:

> The other prohibitions in the clause respect the power of making war, which is appropriately confided to the national government. The setting on foot of an army, or navy, by a state in times of peace, might be a cause of jealousy between neighbouring states, and provoke the hostilities of foreign bordering nations . . . . Still, a state may be so situated, that it may become indispensable to possess military forces, to resist an expected invasion, or insurrection. The danger may be too imminent for delay; and under such circumstances, a state will have a right to raise troops for its own safety, even without the consent of congress.

3 J. Story, COMMENTARIES ON THE CONSTITUTION § 1398 (1833). The term "war" in the Self-Defense Clause is complementary to the term "invasion" in the Invasion Clause—both require armed hostilities from a sovereign political entity. Arizona has not been invaded by a foreign power, and so has no power to "engage in War." U.S. Const. art. I, § 10, cl. 3.

In short, the Constitution does not countenance Governor Ducey's decision to build an unauthorized barrier on federal land. And even if the Self-Defense Clause afforded the Governor power to address international immigration issues, that power could not extend to allow the Governor to occupy and use federal lands in open contravention of the Property and Supremacy Clauses. *See supra* Argument part III.

## V.   AS A CHALLENGE TO THE UNITED STATES' TITLE, CLAIM FIVE FAILS FOR THE SAME REASONS AS CLAIM ONE

Governor Ducey's Fifth Claim for Relief alleges that Federal Defendants "at most possess an easement over the State's underlying possession of the land subject to the Roosevelt Reservation." Compl. ¶ 96. Like the First Claim, this claim disputes the United States' ownership of the lands at issue and must be asserted, if at all, under the QTA. *See Babbitt*, 38 F.3d at 1074 (stating that "the QTA's general waiver of sovereign immunity . . . appl[ies] to cases involving claims for less than fee simple title interests to disputed property"). Because this easement claim disputes the United States' full title and is otherwise vague and untimely, it fails for the reasons discussed above. *See supra* Argument part I.A-B.

## VI.   THE COMPLAINT DOES NOT ALLEGE A COGNIZABLE COMMON LAW NUISANCE CLAIM

Governor Ducey's Sixth Claim for Relief seeks a declaration "that the circumstances on Arizona's southern border present a public nuisance which the State is authorized to abate."

FEDERAL DEFENDANTS' MOTION TO DISMISS                                                30

Compl. ¶ 101.  This claim fails for at least three reasons.  First, a common law nuisance claim fails because any such claim is non-justiciable under the political question doctrine.  Second, there is no applicable waiver of sovereign immunity to bring a nuisance claim seeking equitable relief against the United States.  Third, Congress has displaced any federal common law nuisance claim arising from management of the international border.

### A.      The Governor's Nuisance Claim Raises a Non-Justiciable Political Question.

Governor Ducey seeks the same relief under the guise of a common law nuisance claim as he does for his claims under the United States Constitution.  *Compare* Compl. ¶ 92 (seeking declaration that the Governor has constitutional authority to construct border wall) *with id.* ¶ 101 (seeking declaration that the Governor "is authorized to abate" an alleged "nuisance" on the southern border by constructing border wall).  As discussed above, the Governor's constitutional claims raise a non-justiciable political question, and the same is true for this common law nuisance claim seeking the same relief.  Through this claim the Governor asks the Court to determine what quantity and quality of illegal border crossings constitute a "nuisance" and to determine which measures are to be taken to abate any such "nuisance."  This inquiry, however, "implicates foreign policy concerns which have been constitutionally committed to the political branches," would require the Court to make "an ineffective non-judicial policy decision," and provides "no manageable standards to ascertain whether or when an influx of illegal immigrants should be said to constitute [a nuisance]."  *See California*, 104 F.3d at 1091; *see also United States v. Arizona*, 2011 WL 13137062, at *5 (same).  For these reasons, the Court lacks jurisdiction over this alleged nuisance claim.  *Cf. Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 873-77 (N.D. Cal. 2009) (holding that common-law claim for nuisance regarding greenhouse gas emissions a non-justiciable political question), *aff'd on other grounds*, 696 F.3d 849 (9th Cir. 2012).

### B.      The Nuisance Claim is Barred by Sovereign Immunity.

Just as with Governor Ducey's challenges to the United States' title to the lands underlying the Roosevelt Reservation, the Complaint identifies no congressional waiver of

sovereign immunity that would allow the Governor to bring a nuisance claim.[6]  The Federal Tort Claims Act ("FTCA") provides the exclusive waiver of sovereign immunity over nuisance claims against the United States, but the Governor's nuisance claim for equitable relief exceeds that waiver.  With no applicable waiver of sovereign immunity, this claim fails for lack of subject matter jurisdiction.

Governor Ducey's nuisance claim sounds, if at all, in tort.  *See Restatement (Second) of Torts* § 821B (1979).  "In 1946, Congress passed the FTCA, which waived the sovereign immunity of the United States for certain torts committed by federal employees."  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  "Tort claims against the United States are exclusively cognizable under the [FTCA]," *DSI Corp. v. Sec'y of Housing and Urban Dev.*, 594 F.2d 177, 180 (9th Cir. 1979), and "comprehensively treated therein," *Safeway Portland Emp. Fed. Credit Union v. FDIC*, 506 F.2d 1213, 1216 (9th Cir. 1974).  But this waiver of sovereign immunity has limits that are to be "strictly observed."  *See Block*, 461 U.S. at 287.  Applicable here, the FTCA's consent to suit for tort claims against the United States only allows a plaintiff to seek money damages.  28 U.S.C. § 1346(b).[7]  By expressly permitting suit for money damages, the FTCA impliedly precluded claims for equitable relief, such as the declaratory relief the Governor seeks.  *See Westbay Steel, Inc. v. United States*, 970 F.2d 648, 651 (9th Cir. 1992) ("[T]he only relief provided for in the FTCA is money damages.").

As such, the FTCA would provide no waiver of sovereign immunity over this claim.  The Governor's nuisance claim must be dismissed for lack of subject matter jurisdiction.

---

[6] The Complaint again cites the Declaratory Judgment Act.  Compl. ¶ 101 (citing 28 U.S.C. §§ 2201-02).  But that Act is neither a waiver of sovereign immunity nor an independent grant of jurisdiction.  *Brownell v. Ketcham Wire & Mfg. Co.*, 211 F.2d 121, 128 (9th Cir. 1954).

[7] Other provisions would also preclude application of the FTCA to the Governor's claim.  *See, e.g.*, *Bartleson v. United States*, 96 F.3d 1270, 1276 (9th Cir. 1996) ("A tort claim against the United States must first be presented in writing to the appropriate federal agency within two years of its accrual." (citing 28 U.S.C. § 2401)); *Chadd v. United States*, 794 F.3d 1104, 1108-09 (9th Cir. 2015) (discretionary function exception); *Firebaugh Canal Water Dist. v. United States*, 712 F.3d 1296, 1303-04 (9th Cir. 2013) (private analog and discretionary function).

### C.   Congress Has Displaced any Federal Common-Law Claim for Nuisance by Delegating the Control, Protection, and Management of Federal Lands along the Southern International Border to Federal Agencies.

The Complaint purports to bring a common law nuisance claim, seeking a declaration that the State may abate the alleged nuisance at the southern border.  Compl. ¶ 101.  Put differently, Governor Ducey asks the Court to find and develop a common law of nuisance that would allow him to determine whether and how to implement measures intended to control, guard, and manage federal lands along the international border.  Even if such a claim were justiciable and the United States had waived its sovereign immunity over it, the Governor's extraordinary request for the development of common law in this context would fail because Congress has displaced any such claim by delegating these responsibilities to DHS, the Department of Agriculture, and the Department of the Interior.

Although courts can develop federal common law if "a federal rule of decision is necessary to protect uniquely federal interests," *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981), a claim "can be brought under federal common law for public nuisance only when the courts are 'compelled to consider federal questions which cannot be answered from federal statutes alone,'" *Native Vill. of Kivalina*, 696 F.3d at 856 (quoting *City of Milwaukee v. Illinois*, 451 U.S. 304, 314 (1981)).[8]  If "federal statutes directly answer the federal question, federal common law does not provide a remedy because legislative action has displaced the common law."  *Id.*  A "statute speaks directly to the question at issue," *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 424 (2011), if it authorizes an agency to resolve that question.  Congress's "delegation" of authority to the agency to decide how best to resolve the question "is what displaces federal common law."  *Id.* at 426.  Thus, although it might be

---

[8] The Complaint does not specify whether it brings a claim under federal or state common law.  *See* Compl. ¶ 98-101.  Because of the strong federal interests implicated by any such claim, federal common law, if any, would apply.  As a result, any claim under state common law would be preempted.  *See Int'l Paper Co. v. Ouellets*, 479 U.S. 481, 488 (1987) (noting if a case "should be resolved by reference to federal common law," then "state common law was preempted.").

considered a nuisance at common law, "conduct that is fully authorized by statute, ordinance or administrative regulation does not subject the actor to tort liability." *Restatement (Second) of Torts* § 821B cmt. F (1965).

Here, Congress has directly spoken to the federal interest in controlling, guarding, and managing federal lands along the southern international border by delegating those functions to DHS, the Department of Agriculture, and the Department of the Interior. As detailed in Section III.B above, Congress has delegated to the Forest Service and Reclamation the authority to manage the use and occupancy of these lands. Moreover, Congress delegated to DHS "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). To do this, Congress, among other things, authorized the Secretary of DHS to "take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border." IIRIRA § 102(a) (codified as amended at 8 U.S.C. § 1103 note). Congress also gave the Secretary the discretion to decide how, when, and where to construct barrier. *See* IIRIRA § 102(b)(1).

In short, Governor Ducey asks the Court to create a federal common law of nuisance that would allow Arizona to act on federally-owned lands along an international boundary in a manner that conflicts with Congress's delegation of authority to federal agencies to control, guard, and manage those lands. That claim has been displaced by Congress and must be dismissed.

## **CONCLUSION**

Governor Ducey's claims either fail to establish this Court's jurisdiction or fail to state a claim on which relief can be granted, or both. These claims cannot be remedied through an amended pleading. Therefore, Federal Defendants respectfully request that the Court dismiss this case with prejudice.

Respectfully submitted this 23rd day of November, 2022,

GARY M. RESTAINO
United States Attorney
District of Arizona

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

*/s/ Andrew A. Smith*
ANDREW A. SMITH
(NM Bar No. 8341)
Senior Trial Attorney
Natural Resources Section
c/o United States Attorney's Office
201 Third Street, N.W., Suite 900
P.O. Box 607
Albuquerque, New Mexico 87103
Phone: (505) 224 1468
andrew.smith@usdoj.gov

SHAUN M. PETTIGREW
(Calif. Bar No. 254564)
Senior Trial Attorney
Natural Resources Section
c/o NOAA, Damage Assessment
7600 Sand Point Way, NE
Seattle, Washington 98155
Phone: (206) 526-6881
shaun.pettigrew@usdoj.gov

TYLER M. ALEXANDER
(Calif. Bar No. 313188)
Trial Attorney
Natural Resources Section
PO Box 7611
Washington, DC 20044-7611
Phone: (202) 305-0238
tyler.alexander@usdoj.gov

*Attorneys for Federal Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 23rd day of November, 2022, I filed the foregoing document electronically through the CM/ECF system, which caused all parties or counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*/s/  Andrew A. Smith*
Andrew A. Smith
U.S. Department of Justice
