Brett W. Johnson (#021527)
Colin P. Ahler (#023879)
Ryan J. Regula (#028037)
Charlene A. Warner (#037169)
SNELL & WILMER L.L.P.
One East Washington Street
Suite 2700
Phoenix, Arizona 85004
Telephone:  602.382.6000
Facsimile:  602.382.6070
E-Mail: bwjohnson@swlaw.com
        cahler@swlaw.com
        rregula@swlaw.com
        cwarner@swlaw.com

Anni L. Foster (#023643)
General Counsel
Office of Arizona Governor Douglas A. Ducey
1700 West Washington Street
Phoenix, Arizona 85007
Telephone: 602-542-4331
E-Mail: afoster@az.gov

*Attorneys for Plaintiff Douglas A. Ducey,*
*Governor of the State of Arizona*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Douglas A. Ducey, Governor of the State of Arizona, in his official capacity,<br><br>Plaintiff,<br><br>v.<br><br>Randy Moore, Chief of the United States Forest Service, in his official capacity; Camille Calimlim Touton, Commissioner of the United States Bureau of Reclamation, in her official capacity; Thomas J. Vilsack, United States Secretary of Agriculture, in his official capacity; United States Forest Service; and United States Bureau of Reclamation,<br><br>Defendants. | No. 22-cv-01814-DGC<br><br>**PLAINTIFF'S RESPONSE TO FEDERAL DEFENDANTS' MOTION TO DISMISS**<br><br>**(ORAL ARGUMENT REQUESTED)** |

## I.    **Introduction**

There is no dispute that Arizona is facing an unprecedented crisis at the southern border. Despite Arizona's efforts to manage the situation, the gaps resulting from the federal government's abdication of border wall construction between the United States and Mexico has created an unsustainable humanitarian and security crisis. This in turn has resulted in a substantial strain on Arizona's resources and opened a gateway for bad actors to exploit the crisis through drug and human trafficking and other crime. (Doc. 1 ¶¶ 19, 21–30.)

Consequently, following more than a year of unfulfilled promises by the federal government and after the Arizona Legislature appropriated funding, Plaintiff Governor Ducey issued Executive Order 2022-04 on August 12, 2022, directing the Division of Emergency Management ("Emergency Management"), within the Arizona Department of Emergency and Military Affairs ("DEMA"), to close the gaps in Arizona's southern border wall. (Doc. 1-2 at Ex. 3.) To complete this task, DEMA coordinated filling the gaps to create a solid and sustainable—but *temporary* barrier—until the federal government finally provides a permanent solution.

Arizona continues to be eager to work with the federal government to develop a more permanent solution—as evidenced by the stipulation to remove the temporary barrier recently filed in case No. 2:22-cv-02107-PHX-SMB before Judge Brnovich, which the Governor agreed to because of the federal government's assurances that it would finally address the border wall gaps. (*See* Doc. 31.) Still, Arizona's authority to take proactive action on its border to ensure the health and safety of its citizens requires resolution. Otherwise, Arizona will continue to be subject to the whims of the federal government on whether it can address an ongoing public nuisance. Federal Defendants' litany of arguments attacking both jurisdiction and the merits of the Governor's claims all fail. As such, and for the reasons detailed below, the Court must deny Federal Defendants' Motion to Dismiss (Doc. 24.)

1

## II.    <u>**Factual Background**</u>

At the heart of this case is the Roosevelt Reservation, a sixty-foot strip of land on the border between the United States and Mexico. On May 27, 1907, President Theodore Roosevelt issued Proclamation 758, reserving "from entry, settlement or other form of appropriation under the public land laws and set apart as a reservation, all public lands within sixty feet of the international boundary between the United States and the Republic of Mexico, within the … Territor[y] of Arizona." (Doc. 1 ¶ 46; Doc. 24.) The Roosevelt Reservation did not cite any statute or other source authorizing this action, but instead only referenced that it was "necessary for the public welfare" to reserve the land from "the operation of public land laws and kept free from obstruction as a protection against the smuggling of goods between the United States and [the] Republic [of Mexico]." (Doc. 1 ¶ 47.) Further, although the United States retained ownership of certain public lands as a condition of statehood in the New Mexico-Arizona Enabling Act, 36 Stat. 557, 569 § 20 (June 20, 1910), this did not include the Roosevelt Reservation, as Arizona disclaimed only "right and title to the *unappropriated* and ungranted *public lands* lying within the boundaries" of the State. (Doc. 24 at 3 (emphasis added).)

In 2017, following unprecedented numbers of migrants illegally crossing the southern border, the federal government initiated construction of a border wall between the United States and Mexico, including along the southern border of Arizona. (Doc. 1 ¶ 15.) Notably, due to the emergent necessity, this construction was not preceded by nor required federal permits. However, the federal government later abandoned the effort, leaving much of the equipment and materials used to build the wall in the disputed areas in this case. (*See id.*) Further, the federal government's actions left states without the means or support to continue construction and caused them to remain vulnerable to exploitation of the unprotected border. (*See id.*) Indeed, the numerous gaps left in the border wall opened the floodgates for foreign nationals, international drug and human trafficking activity and other

crime to flow into Arizona.[1] (*Id.* ¶ 16.) The federal government's inaction further caused a humanitarian crisis as migrants overwhelm Arizona's border towns. (*Id.* ¶¶ 16–19.)

Due to the significantly worsening conditions on Arizona's southern border and unrelenting demand on private, local, and state resources, Governor Ducey was left with no choice but to take action to protect Arizona citizens. (*Id.* ¶ 31.) Exercising his authority under A.R.S. § 26-303, Governor Ducey declared a state of emergency designed to address the crisis on April 20, 2021. (*Id.* ¶ 32.) Unfortunately, the State's continued pleas to the federal government to complete border wall construction—the first step in addressing the problem—was met with silence or empty promises, causing the border crisis to become even more unsustainable. (*Id.* ¶¶ 35–38.) Thus, following more than eight months of unfulfilled promises that the federal government would take action to address the border crisis, on August 12, 2022, Governor Ducey issued Executive Order 2022-04. (*Id.* ¶ 43; Doc. 1-2 at Ex. 3.) In line with the authority granted by the Arizona Legislature, this Executive Order directed DEMA to immediately close the gaps in Arizona's southern border wall. (Doc. 1 ¶ 43–44.) Soon thereafter, Governor Ducey directed DEMA to use the funding appropriated by the Legislature to create a solid, sustainable barrier in the border wall gaps, until such time as the federal government erected a permanent solution. (*Id.* ¶ 44; *see also* Doc. 24 at 4.)

Rather than cooperating with Arizona to deal with the crisis it created, the federal government obstructed Governor Ducey's well-reasoned and measured actions. (Doc. 1 ¶ 49; Doc. 24 at 4–5.) On September 16, 2022, DEMA notified Coronado National Forest personnel that it was seeking authorization to place barriers on National Forest land to fill in gaps in the border wall. (Doc. 1 ¶ 52.) However, on October 7, 2022, the United States Forest Service ("Forest Service") responded that it had not authorized the barrier, that

---

[1] As just some examples of the repercussions of this crisis, the Tucson Sector recorded an 828% increase in events involving Fentanyl between 2019 and the first eight months of 2022. (Doc. 1 ¶ 22–23.) Arizona has also significantly outpaced the national average each year for violent crime offenses between 2011 and 2020. (*Id.* ¶ 24.) Cochise County (where the Roosevelt Reservation is located) specifically experienced an 18% rise in violent crime between 2020 and 2021, and multiple cities reporting marked increases in aggravated assaults, homicides, and other violent crimes. (*Id.* ¶¶ 26–30, 55.)

Arizona would need to undergo a lengthy federal regulatory approval process, and that DEMA must "refrain from any further activity associated with the containers on Forest Service lands, including the use of any equipment, until such time as a proper authorization is secured." (Doc. 1 ¶ 53; *see also* Doc. 24 at 4.)[2]

Despite the State's efforts, no action was taken to address Arizona's concerns. (Doc. 1 ¶ 54.) Accordingly, on October 7, 2022, DEMA notified the Forest Service that it intended to close a 10-mile gap in Cochise County—which includes land within the Roosevelt Reservation—to ensure the safety of Arizona citizens and requested cooperation from the Forest Service in achieving this vital goal. (*Id.* ¶ 55.)

## III.  **Argument**

### A.  **Governor Ducey States a Proper Constitutional Challenge to the Roosevelt Proclamation.**

Federal Defendants seek dismissal of Governor Ducey's constitutional challenge to the Roosevelt Proclamation ("Count One") by arguing that: (1) the Proclamation was somehow a valid presidential act; (2) the Proclamation did not impact any state lands; (3) the Quiet Title Act ("QTA") provides the *only* possible source of sovereign immunity waiver, but the Governor has not complied with the QTA's procedural requirements; and (4) the claim is time-barred. (Doc. 24 at 7–16.)[3] All four arguments fail.

#### 1.  **The Roosevelt Reservation Is Unconstitutional.**

President Roosevelt did not issue the Roosevelt Proclamation pursuant to a permissible exercise of any federal executive authority. There are two possible sources of authority for "executive orders and presidential proclamations." *See W. Watersheds Project v. Bureau of Land Mgmt.*, 629 F. Supp. 2d 951, 962 (D. Ariz. 2009). They "can be [1] issued pursuant to the President's congressionally delegated authority, or [2] pursuant to the

---

[2] BOR similarly attempted to impose lengthy, administrative roadblocks to hinder this vital project. (Doc. 1 ¶¶ 50-51.)

[3] Federal Defendants order their arguments on Count One differently. However, it is more proper to start with the Proclamation being unconstitutional, and then respond to the Federal Defendants' alternative arguments.

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2202
602.382.6000

President's authority under the Constitution and laws of the United States." *Id.* at 962 n.3 (internal citations omitted). But such executive action *must* fall within one of these two sources; otherwise, it is unconstitutional. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 587 (1952).

Importantly, *Youngstown* rejected the idea that "presidential power should be implied from the aggregate of [the President's] powers under the Constitution." *Id.* at 587. Thus, *Youngstown* held that a presidential order was invalid where it was not rooted in any specific statutory or constitutional authority, but rather was justified based on the subjective "well-being and safety of the Nation." *Id.* at 583–84, 589 (rejecting idea that a "strike disrupting steel production . . . would so endanger the well-being and safety of the Nation that the President had 'inherent power'" to direct the "Secretary of Commerce to take possession of most of the steel mills and keep them running.").

The Roosevelt Proclamation is similarly defective. It cites no specific constitutional provision or statute to justify its action. Instead, the Proclamation relies generically on "the public welfare" to justify why the Roosevelt Reservation swath of land should be reserved and "kept free from obstruction as a protection against the smuggling of goods." But *Youngtown* made clear that such generalities are not enough for presidential action to be constitutional.  Indeed, the Roosevelt Reservation is akin to President Truman's ill-fated order in *Youngstown*, which was similarly premised on nothing more than the "well-being and safety of the Nation." 343 U.S. at 583–84.

The cases cited by Federal Defendants do not alter this analysis. They either predate *Youngstown* by nearly four decades, *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915), or do not even attempt to address *Youngstown. See Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845 (9th Cir. 2017); *United States v. S. Pac. Transp. Co.*, 543 F.2d 676 (9th Cir. 1976).

The facts of the latter two cases are also easily distinguished. *Zinke* concerned a challenge to the Department of Interior's withdrawal of over one million acres of National Forest Land from a mining development. 877 F.3d at 857, 858–60. Twice, *Zinke* referenced *Midwest Oil*. But the first reference simply concerned mineral conservation—not "well-

being and safety of the public" (*Youngstown*) or "public welfare" to protect against smuggling (Roosevelt Proclamation). *Id.* at 854–55. The second reference stands only for the point that the Federal Land Policy and Management Act ("FLPMA") "eliminates the implied executive branch withdrawal authority recognized in *Midwest Oil*, and substitutes express, limited authority." *Id.* at 856. Although *Zinke* does not mention *Youngstown*, Congress's development of the FLPMA, and *Zinke's* recognition that a statute supersedes an implied authority, is in line with *Youngstown's* holding.

*Southern Pacific*, which concerned the ability of Native American Tribes to use an executive order creating a reservation to successfully assert trespass against a railroad, is even more distinguishable. 543 F.2d at 686. Federal Defendants reference language in the *Southern Pacific* opinion for the proposition that the President has used executive authority in a variety of circumstances (*i.e.*, "for Indians or for other purposes"). *Id.*; (Doc. 24 at 14.) However, these circumstances are much more limited than Federal Defendants insinuate and do not stand for a universal recognition that presidents may take whichever actions they please. Instead, these "other purposes" are limited to (1) mineral conservation, as demonstrated by *Midwest Oil* and *Zinke*, and (2) military use. *S. Pac. Transp. Co.*, 543 F.2d at 686 (citing *Grisar v. McDowell*, 73 U.S. 363 (1868)). Thus, none of these cases provide a means to overcome *Youngstown's* prohibition against generically relying on public welfare as grounds for an executive proclamation.

Ultimately, *Youngstown* is still good law and controls the analysis here. As such, Roosevelt Proclamation is unconstitutional.

**2.  Arizona Did Not Divest its Right to the Land.**

Federal Defendants' contention that the Roosevelt Proclamation did not divest any lands from State ownership relies on an incomplete analysis of both (1) the New Mexico-Arizona Enabling Act ("Enabling Act") and (2) the Proclamation itself.

As relevant here, the Enabling Act provides that "all lands granted in quantity, or as indemnity, by this Act, shall be selected, under the direction and subject to the approval of the Secretary of the Interior, from the surveyed, *unreserved*, unappropriated, and

nonmineral *public lands* of the United States within the limits of said State . . ." 36 Stat. 557, 575 § 29 (emphasis added). Meanwhile, "the people inhabiting said proposed State" agreed only "that they forever disclaim all right and title to the *unappropriated* and ungranted *public lands* lying within the boundaries thereof." *Id.* at 569 § 20 (emphasis added), 576 § 30 ("[A]ll grants of lands heretofore made by any Act of Congress to said Territory, except to the extent modified or repealed by this Act, are hereby ratified and confirmed to said State, subject to the provisions of this Act . . .").

Before the Enabling Act was issued, the Roosevelt Proclamation "reserved" the lands encompassed by the Proclamation "from the operation of the public land laws" by "reserv[ing]" those lands "from entry, settlement or other form of appropriation under the public land laws and set apart as a public reservation" a sixty foot strip of land on the southern border. (Doc. 1, Ex. 4 (Proclamation 758, May 27, 1907)). As such, because the Roosevelt Reservation was excluded from the relevant public lands provisions in the Enabling Act, Arizona did not disclaim all rights to the underlying land in that Reservation. The Roosevelt Reservation was instead reserved from the pool of lands that *could* have been appropriated, but were not, at the time of Arizona's entry as a state. Because the Roosevelt Proclamation is not supported by any constitutional or statutory authority, the Roosevelt Reservation falls into the group of lands considered for selection under Section 29 of the Enabling Act and is *not* part of the lands that Arizona disclaimed. Thus, the Roosevelt Reservation cannot be considered federal land.

### 3. The QTA Does Not Apply, and the Governor Does Not Need the QTA to Identify a Sovereign Immunity Waiver.

Federal Defendants' sovereign immunity defense is premised on the notion that Count One is really a QTA claim in disguise, and that the QTA is the *only* possible source of sovereign immunity waiver. This theory suffers from several defects.

First, Federal Defendants filed their Motion to Dismiss before the United States brought separate suit against the Governor (and other State officials) for trespass damages and remediation based on the State's temporary solution to the border wall gaps. *See*

Complaint, *United States v. Ducey*, No. 2:22-cv-02107-SMB (Dec. 14, 2022).[4] By bringing that action, the federal government waived any sovereign immunity defense. *Cf. Bull v. United States*, 295 U.S. 247, 260–63 (1935) (when the United States brings suit, it impliedly waives its immunity as to all claims asserted by the defendant in recoupment).

Second, Governor Ducey did not assert Count One under the QTA because it does not apply. As such, Federal Defendants' extended discussion of the QTA's procedural requirements is an irrelevant sideshow. Unlike this case, the QTA allows the United States to "be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights." 28 U.S.C. § 2409a(a). Under this provision, "Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' *title* to real property." *Block v. North Dakota*, 461 U.S. 273, 286 (1983) (emphasis added).

Thus, a QTA claim "is universally understood to refer to suits in which a plaintiff not only challenges someone else's claim, but also asserts *his own right* to disputed property." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 217 (2012) (emphasis added). As such, the plaintiff must expressly "claim a property interest to which title may be quieted." *Friends of Panamint Valley v. Kempthorne,* 499 F.Supp.2d 1165, 1174 (E.D.Cal.2007) (under the QTA, "Congress . . . permitted challenges to the United States' claim of title to real property *only to parties who themselves claim an interest in title*." (emphasis added)); *see also Patchak*, 567 U.S. at 220 (claim did not fall under QTA because the plaintiff did not contend that he owned the property, nor did he "seek any relief corresponding to such a claim . . . [his] lawsuit therefore lacks a defining feature of a QTA action."); *Leisnoi, Inc. v. United States,* 267 F.3d 1019, 1023 (9th Cir.2001) (in a QTA action, plaintiff must have initiated an actual title dispute against United States). Because of this requirement, an action can fall outside the QTA even if a

---

[4] Federal Defendants argue that the two cases are so similar that they should be consolidated. (Doc. 28.) If that is correct, then plainly any sovereign immunity defense has become moot.

plaintiff's action seeks to "strip the United States of title to the land . . ." *Patchak*, 567 U.S. at 220.

Here, Governor Ducey did not ask the Court to declare that he owns the Roosevelt Reservation. (*See* Doc. 24 at 8–9); *cf. Patchak*, 567 U.S. at 220–21. Rather, in Count One, Governor Ducey challenges Federal Defendants' claimed jurisdiction over the Roosevelt Reservation as *ultra vires* agency action and seeks: (1) a declaration "that the Roosevelt Reservation is unconstitutional as a matter of law and has no force or effect" and (2) an injunction barring federal actors "from attempting to exercise jurisdiction over the Roosevelt Reservation." (Doc. 1 ¶¶ 69–70, 73, 80–81; *see also* Prayer for Relief.) Governor Ducey thus seeks to clarify the *constitutional status* of the Roosevelt Reservation, and the resultant federal jurisdiction over the area. "[D]isputes concerning the status or boundaries of land are not 'title' disputes." *Montara Water & Sanitary Dist. v. Cnty. of San Mateo*, 598 F. Supp. 2d 1070, 1076 (N.D. Cal. 2009). Federal Defendants rely on *Block*, but that case is readily distinguished because the plaintiff state in that case actually asserted title to the disputed property and, therefore, could not circumvent the QTA under an *ultra vires* theory. 461 U.S. at 277, 284. Because the QTA does not apply to Count One, Governor Ducey had no obligation to comply with its procedural requirements.[56]

Third, even setting aside the United States' separate, affirmative suit against the Governor that waived any immunity defense, Governor Ducey has other sources of

---

[5] Governor Ducey's other claims for relief also fall outside of the QTA. The Complaint's second and third claims for relief are jurisdictional arguments that do not challenge the United States' claim of title.  (Doc. 1 ¶¶ 74–86.) Similarly, the Governor's fourth claim seeks a declaration that Arizona has "constitutional authority" to take the steps it did, rather than challenging actual title to the Roosevelt Reservation. (*Id.* ¶¶ 87–92.)[5] Finally, the Governor's sixth claim for relief requests a declaration that the "circumstances on Arizona's southern border present a public nuisance which the State is authorized to abate." (*Id.* ¶ 101.) The QTA simply does not apply to the Governor's Complaint.

[6] Federal Defendants argue that the QTA's statute of limitations is jurisdictional. This precise issue is currently before the U.S. Supreme Court, having just been submitted following oral argument on November 30, 2022. *See, e.g.*, Brief for Petitioners at i, *Wilkins v. United States*, No. 21-1164 (Aug. 4, 2022) ("Question Presented[:] Whether the Quiet Title Act's statute of limitations is a jurisdictional requirement or a claim-processing rule?"); S. Ct. Docket, *Wilkins v. United States*, No. 21-1164 (listing oral argument on Nov. 30, 2022).

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2202
602.382.6000

sovereign immunity waiver that do not implicate the QTA. "No waiver is needed in a suit challenging the enforcement of a statute when 'the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional.'" *United States v. Vazquez*, 145 F.3d 74, 79 (2d Cir. 1998) (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690 (1949) (reasoning that where a "statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional . . . the conduct against which specific relief is sought is beyond the officer's powers and is, therefore, not the conduct of the sovereign.")). The *Larson* exception to sovereign immunity is "well-established." *Id.*

Moreover, under 5 U.S.C. § 702,[7] the federal government consented to a "general waiver of sovereign immunity" for claims challenging the constitutionality of a law or where federal agency action is alleged to be unconstitutional. *Vazquez*, 145 F.3d at 80; *see also Parola v. Weinberger*, 848 F.2d 956, 958 (9th Cir.1988) (recognizing that the United States has waived sovereign immunity "in suits seeking judicial review of agency actions where judicial review has not been expressly authorized by statute."). To be clear, this waiver is *not* limited to actions brought specifically under the under the Administrative Procedure Act ("APA"), but instead "applies when any federal statute authorizes review of agency action, as well as in cases involving constitutional challenges and other claims arising under federal law." *Michigan v. U.S. Army Corps of Engineers,* 667 F.3d 765, 775 (7th Cir. 2011) (collecting cases); *see also Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir.1989); *Veterans for Common Sense v. Shinseki*, 644 F.3d 845,

---

[7] Section 702 provides:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party . . .

5 U.S.C. § 702.

865–67 (9th Cir. 2011) (holding that section 702 waived sovereign immunity for injunctive relief based on the Constitution). This waiver also applies regardless of whether there has been any "final agency action." *Michigan*, 667 F.3d at 775.

True, the waiver found in the APA does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought" by the plaintiff. *Patchak*, 567 U.S. at 215. But here, neither the QTA nor any other statute bars Governor Ducey's requested relief. *See Patchak*, 567 U.S. at 220–21 (where the QTA's limitation of remedies had no bearing on the plaintiff's suit, the "APA's general waiver of sovereign immunity instead applies.").

For all these reasons, Federal Defendants' attempt to invoke a sovereign immunity defense fails.

### 4.     The Claim is Not Time-Barred by 28 U.S.C. § 2401(a).

Federal Defendants are also incorrect that the six-year statute of limitations in 28 U.S.C. § 2401(a) bars Count One. Under Federal Defendants' logic, unconstitutional laws would be completely insulated from facial challenges after only a few years. *Nw. Immigrant Rts. Project v. Sessions*, No. C17-716 RAJ, 2017 WL 6492703, at *2 (W.D. Wash. Dec. 19, 2017) (citing *Scheer v. Kelly*, 817 F.3d 1183, 1188 (9th Cir. 2016)). But that is not the law. *Cf. Lawrence v. Texas*, 539 U.S. 558 (2003) (permitting facial challenge to a 1970s statute where injury under that statute did not accrue until 1998); *Brown v. Barry*, 710 F. Supp. 352 (D.D.C. 1989) (same for facial challenge against statute that had been in effect for nearly a century). Indeed, a statute of limitations typically does not apply to a facial challenge to an unconstitutional statute because such a statute inflicts a continuing harm. *See Napa Valley Publ'g Co. v. City of Calistoga*, 225 F. Supp. 2d 1176, 1184 (N.D. Cal. 2002); *see also Maldonado v. Harris*, 370 F.3d 945, 955 (9th Cir. 2004) (expressing "serious doubts that a facial challenge under the First Amendment can ever be barred by a statute of limitations."); *Nat'l Advert. Co. v. City of Raleigh*, 947 F.2d 1158, 1168 (4th Cir. 1991) (same); *Sessions*, 2017 WL 6492703, at *2 (same for Tenth Amendment); *Doe as Next Friend of Doe #6 v. Swearingen*, 51 F.4th 1295, 1304 (11th Cir. 2022) ("Because the enforcement of an

unconstitutional statute causes an injury, a person can challenge a statute enacted long ago based on a new threat of enforcement . . .")

Moreover, even if 28 U.S.C. § 2401(a) applies, Federal Defendants cannot show, especially at the motion to dismiss stage, that the Governor's claim accrued more than six years ago. Facial constitutional challenges generally accrue when the *plaintiff's* injury occurred under that statute, *not* when the statute or similar provision was enacted. *See Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 688 (9th Cir. 1993) ("the harm inflicted by [an unconstitutional] statute is continuing, or does not occur until the statute is enforced—in other words, until it is applied."); *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1063 (9th Cir. 2002) (facial challenge to city's public nuisance abatement ordinance was not barred by statute of limitations where the ordinance was enforced against the owners within the limitations period). If the action accrued when the challenged provision was enacted, this would create "severe problems establishing standing" and would "bar facial challenges . . . before they could even be brought, an absurd result." *Scheer*, 817 F.3d at 1188.

Here, Governor Ducey's facial, constitutional challenge to the Roosevelt Proclamation had not yet accrued on May 27, 1907, when the Roosevelt Proclamation was issued in pre-statehood days. 35 Stat. 2136.[8] Instead, Governor Ducey's injury only accrued in 2022 when Federal Defendants failed to fulfill their duties under Article IV, Section 4 of the U.S. Constitution and interfered with his authority, under the State's police powers, to manage and respond to an imminent and ongoing crisis that implicates the sovereignty of the State. This first occurred when Federal Defendants initially demanded that Governor Ducey obtain permits and halt construction of the temporary border barrier. (*See* Doc. 1 ¶¶ 51, 53.) Thus, at the earliest, Federal Defendants' *ultra vires* actions occurred either when

---

[8] Even if the claim accrued in 1907 when the Roosevelt Proclamation was issued, 28 U.S.C. § 2401(a) would not supply the applicable statute of limitations. Rather, when a "claim accrued prior to the effective date of [the] Amendments to" § 2401(a), the previous act would apply and not the amended. *Phillips Pipe Line Co. v. United States*, 299 F. Supp. 768, 771–72 (W.D. Okla. 1969). Given that this statute was only enacted until June 25, 1948, its statutes of limitations would not apply to Governor Ducey's facial, constitutional challenge to the Roosevelt Reservation.

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2202
602.382.6000

1    they demanded on August 9, 2022, that Governor Ducey obtain federal permits for the

2    Yuma Valley Railroad, or on October 7, 2022 for the Coronado National Forest. (*Id.*)

3    Because both of these events occurred well within six years of accrual, Count One is not

4    time-barred. Indeed, in all likelihood, Governor Ducey would not have had standing to bring

5    this suit on an earlier date. *See Scheer*, 817 F.3d at 1188.

### B.    Federal Defendants Exceeded their Authority by Attempting to Regulate Border Security.

8    Governor Ducey's second claim ("Count Two") asserts that Federal Defendants—

9    which consist of Forest Service, BOR, and officials of those two agencies—acted *ultra vires*

10   in trying to unilaterally regulate border security (and, hence, the health and safety of

11   Arizonans) by seeking to prevent Governor Ducey from installing a temporary barrier in

12   the midst of an ongoing humanitarian crisis. But, similar to their arguments against Count

13   One, Federal Defendants' arguments for dismissal rely on mischaracterizing Count Two.

14   Contrary to Federal Defendants' misdirect, Governor Ducey does not seek to *enforce* the

15   2006 MOU. (Doc. 24 at 17.) Governor Ducey instead relies on the 2006 MOU as *evidence*

16   confirming that the Forest Service and BOR have *no* authority over border security,

17   including in the Roosevelt Reservation, and have acknowledged as much in their dealings

18   with the Department of Homeland Security ("DHS"). (Doc. 1-3 at 7.)

19   More specifically, Governor Ducey alleges that, from a federal perspective, border

20   security is within the exclusive province of DHS (and in turn, Customs and Border Patrol

21   ("CBP")). As support, Governor Ducey explains that the 2006 MOU evidences each federal

22   agency's recognition of its respective jurisdictional limits. For instance, "DHS, through its

23   constituent bureaus (including CBP and its CBP-BP) is statutorily mandated to control and

24   guard the Nation's Borders and boundaries, including the entirety of the northern and

25   southern land and water borders of the United States." (*Id.*) Conversely, Federal Defendants

26   "have responsibility for enforcing Federal laws relating to land management, resource

27   protection, and other such functions on Federal lands under their jurisdiction." (*Id.* at 8.)

28   And the "Parties [to the MOU] acknowledge[d] that CBP operation and construction within

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2202
602.382.6000

the sixty-foot 'Roosevelt Reservation' of May 27, 1907 (along the US-Mexico border) . . . is consistent with the purpose of those reservations and that any CBP activity (including, but not limited to, operations and construction) within the sixty-foot reservation[ ] is outside the oversight or control of Federal land managers." (*Id.* at 7.)

The 2006 MOU thus confirms what common sense dictates: at the federal level, border security, including in the Roosevelt Reservation, is DHS' responsibility, *not* the Forest Service or BOR. Interestingly, DHS has not made an appearance in this matter or otherwise asserted that this action is contrary to *its* mandate. Instead, as detailed below, the filling of the border wall gaps is an inherent right of both Arizona and the federal government due to concurrent jurisdiction principles.

Notwithstanding the ongoing emergency situation, Federal Defendants have asserted that the urgent crisis at the border must take a backseat to a time-consuming administrative process, with no guaranteed outcome, and overseen by federal agencies that have no responsibility over border security issues. (Doc. 1 ¶ 51, 53, 58–63.) By seeking to prevent Governor Ducey from enforcing Executive Order 2022-04 and carrying out the Arizona Legislature's mandate, Federal Defendants exceeded their respective authority and invaded DHS's role. *See, e.g.*, 36 CFR § 200.3(b)(2)(i). This is the definition of an *ultra vires* act. *Cf. Haitian Centers Council, Inc. v. Sale*, 823 F. Supp. 1028, 1046 (E.D.N.Y. 1993) ("Agency actions that do not fall within the scope of a statutory delegation of authority are *ultra vires* and must be invalidated by reviewing courts.")[9]

**C.    Arizona's Concurrent Jurisdiction Provides Requisite Authority.**

In a federalism system, Federal Defendants cannot contest the main point underlying Count Three: Arizona retains criminal and civil jurisdiction over the lands within the

---

[9] To the extent Federal Defendants argue that Governor Ducey lacks standing to challenge their *ultra vires* action, their argument also fails. Governor Ducey has an actual or imminent, and concrete, injury-in-fact by virtue of the agencies' actions and threats, to stop building and take down the *temporary* border wall. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–62 (1992). Further, Federal Defendants have become increasingly zealous in their attempt to force Governor Ducey to cease construction and remove the shipping containers by initiating a lawsuit against him and several other state entities and individuals. *See United States v. Ducey*, No. 2:22-cv-02107-SMB.

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2202
602.382.6000

Roosevelt Reservation. At a minimum, the State "may punish public offenses, such as murder or larceny, committed on such lands, and may tax private property, such as live stock, located thereon . . ." *Utah Power & Light Co. v. United States*, 243 U.S. 389, 404 (1917); (Doc. 24 at 20). Federal Defendants turn to the Supremacy and Property Clauses to argue that this concurrent jurisdiction does not allow Arizona to take action to redress an ongoing public safety or humanitarian crisis at its border—even in the face of federal inaction. (Doc. 24 at 20–27.) This position is contradictory to Article I, Section 10, Clause 3 of the U.S. Constitution, which limits states from taking action without authorization of Congress "unless . . . in such imminent danger as will not admit delay." It cannot be the law of the land, therefore, that a state must sit idly by in the face of a real and undisputed emergency impacting the state's police powers to preserve health and safety.

The Supremacy Clause provides merely that "federal legislation, together with the policies and objectives encompassed therein [can] necessarily override and preempt *conflicting* state laws, policies and objectives . . ." *Wyoming v. United States*, 279 F.3d 1214, 1227 (10th Cir. 2002) (emphasis added); *accord Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1168 (9th Cir. 2022). The Supremacy Clause does not permit the federal government to impermissibly interfere with state sovereignty. *See Bond v. United States*, 564 U.S. 211, 225 (2011). And here, Federal Defendants seek to strip Governor Ducey of one of his most important sovereign powers: to protect Arizona from the effects of the border crisis. *See Mayor of N.Y. v. Miln*, 36 U.S. (Pet.) 102, 132–33 (1837).

Indeed, states' sovereign power over land within their boundaries "is one of the keystones upon which our government was founded and is of vital importance to its preservation." *NAACP v. Thompson*, 357 F.2d 831, 832–33 (5th Cir. 1966). Under their reserved police powers, states "have an interest of the highest order in taking measures to protect the populace." *Legacy Church, Inc. v. Kunkel*, 455 F. Supp. 3d 1100, 1154 n.12 (D.N.M. 2020). In the face of public health and safety threats, "Tenth Amendment police and public health powers are at a maximum." *Id.* at 1146. When states enact measures to confront emergencies, courts afford their judgments considerable deference across different

contexts. *See, e.g.*, *RBIII, L.P. v. City of San Antonio*, 713 F.3d 840, 845 (5th Cir. 2013) (destruction of property to combat a public emergency); *S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 939 (9th Cir. 2020) (restrictions designed to combat the spread of infectious disease); *Whitsitt v. Newsom*, No. 220CV00691JAMCKDPS, 2020 WL 4818780, at *2 (E.D. Cal. Aug. 19, 2020) (same); *see also, e.g.*, *United States v. Caltex*, 344 U.S. 149, 154 (1952) (noting "in times of imminent peril . . . the sovereign could, with immunity, destroy the property of a few" if needed to save the lives and properties of the many). In times of emergency, then, the Supremacy and Property Clauses do not and should not bar Governor Ducey, in the exercise of the State's concurrent jurisdiction, from taking temporary measures to protect Arizona citizens from an imminent and ongoing threat to their public health and safety.

Although Federal Defendants prefer to treat this situation as though it were a garden variety failure-to-obtain-a-permit case (which it clearly is not), Governor Ducey's actions here are a necessary response to a real and immediate emergency. This case involves an ongoing, unprecedented crisis within Arizona (Doc. 1 ¶ 1), which is only likely to worsen if the federal government succeeds in its attempt to terminate Title 42, the only federal policy that is currently preventing an exponential increase in border crossings and allows for an expedited expulsion process at the border. *See* Emergency Application for Stay Pending Certiorari*, Arizona v. Mayorkas*, No. 22A544, at 37–38 (Dec. 19, 2022) (emphasizing that the termination of Title 42 would result in a three-fold increase on daily border crossings that "will necessarily increase the States' law enforcement, education, and healthcare costs," and that DHS has requested *$3-4 billion* in emergency funding to deal with the imminent crisis); Order Granting Stay of Title 42 Termination Pending Further Order, *Arizona v. Mayorkas*, No. 22A544 (Dec. 19, 2022) (Roberts, C.J.). The unfilled gaps in the border wall have precipitated a strain on domestic resources in which temporary shelters are quickly reaching capacity, as well as an exponential increase in drug and human trafficking activity and other crime. (Doc. 1 ¶¶ 19, 21–30, 64.) Arizona, and other border states, could not afford to wait for the federal government to act, particularly where the

federal government has been as unresponsive to the plight facing Arizonans. (*Id.* ¶¶ 36–41, 49–54.) If concurrent jurisdiction, or the guarantees of the Constitution, are to mean anything at all, they must mean that Governor Ducey is entitled to take temporary measures—even on federal land—to guard against imminent, ongoing and increasing threats to public health and safety.

Federal Defendants rely heavily on *Utah Power & Light Co.* and *Kleppe v. New Mexico* for the notion that the Governor's actions must yield under the Supremacy and Property Clauses. (Doc. 24 at 21–22, 25–27.) But neither of these cases involved the kind of emergency to which the Governor is responding. For example, *Utah Power* dealt with commercial efforts to build "works employed in generating and distributing electric power" on federal reserved land, without securing federal agency permission. 243 U.S. at 402–03. While the court held that federal law, not state law, controlled their rights in the land, *id.* at 404, it did not address state authority to temporarily enter and occupy federal land in an ongoing emergency for the specific purposes of emergency response and management.

Similarly, *Kleppe* considered whether Congress exceeded its power when it enacted the Wild Free-Roaming Horses and Burros Act. 426 U.S. 529, 529 (1976). Acting under state law, a New Mexico agency entered federal land, seized wild burros protected potentially under the Act, and then sold them at public auction. *Id.* at 533–34. When the government demanded that New Mexico recover and return the animals, New Mexico sought declaratory judgment that the Act was unconstitutional and an injunction against its enforcement. *Id.* at 534. The Supreme Court sustained the law as a valid exercise of congressional power under the Property Clause, concluding that the entry onto public lands to remove the wild burros was contrary to the law and the federal government's plenary power. *Id.* at 546. But *Kleppe* also acknowledged that "a State undoubtedly retains jurisdiction over federal lands within its territory." *Id.* at 543. And, like *Utah Power*, *Kleppe* did not speak to whether a State may enter federal land to abate an imminent and harmful emergency. In fact, the Supreme Court noted that "the furthest reaches of the power granted

by the Property Clause have not yet been definitively resolved." *Id.* at 539. This situation resides in that undefined gray area, and *Kleppe* does not support dismissal here.

The only case cited by Federal Defendants that even remotely touches on a state's authority to take self-help measures is *United States v. Board of County Commissioners of the County of Otero*, 843 F.3d 1208 (10th Cir. 2016). In *Otero*, the Tenth Circuit addressed whether a county board could enter federal land to mitigate fire danger without first obtaining permission from the Forest Service. *Id.* at 1209. In that case, however, no actual fire was occurring; the county board simply wanted to remove or restore vegetation within the forest. *Id.* at 1210–11. Nonetheless, the court held open the possibility "that self-help is permitted in an emergency," noting that the government itself had offered this suggestion. *Id.* at 1215 n.3. Unlike the *prospective* threat of fire from the unmanaged vegetation at issue in *Otero*, the border crisis facing Arizona is currently an ongoing emergency, without federal government mitigation. Under the circumstances, Governor Ducey has the authority to enter federal land to abate the emergency (as directed by Arizona's Legislature) under the State's concurrent jurisdiction. Governor Ducey was not obligated to undergo months or years of federal bureaucracy to obtain permission to address the emergency, as the crisis continually expands.

As such, given Federal Defendants' concession that Arizona retains concurrent jurisdiction over the lands within the Roosevelt Reservation (Doc. 24 at 20), it follows that Governor Ducey has the authority to take action on those lands to address the public health and safety crisis. Count Three thus states a valid claim and should not be dismissed.

**D.     The Invasion and Self-Defense Clauses Also Apply.**

Federal Defendants argue that Governor Ducey's Invasion and Self-Defense Clause claim ("Count Four") should be dismissed because it supposedly requires the resolution of non-justiciable political questions. (Doc. 24 at 27–30.) But they ignore important factual distinctions in the cases they cite for this proposition.[10] In particular, Federal Defendants

---

[10] To the extent *California v. United States*, 104 F.3d 1086 (9th Cir. 1997) controls this Court's decision, Plaintiffs includes these arguments to preserve them for appeal.

rely on cases that involved allegations of ineffective enforcement of immigration laws, not any federal action on the part of the federal government. *Cf. Texas v. United States*, 86 F. Supp. 3d 591, 627 n. 45 (S.D. Tex. 2015) (distinguishing *California*, 104 F.3d at 1091; *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996); *New Jersey v. United States*, 91 F.3d 463, 470 (3d Cir. 1996); and *Chiles v. United States*, 69 F.3d 1094, 1097 (11th Cir. 1995), because "none of the cases involved the Government announcing a policy of non-enforcement . . . DHS has clearly announced that it has decided not to enforce the immigration laws as they apply to approximately 4.3 million.")

This distinction is critical. Here, not only have Federal Defendants abandoned construction of the border wall (Doc. 1 ¶¶ 16, 38), but have actually taken *affirmative* steps to worsen the crisis and obstruct Governor Ducey's attempt to address the crisis himself. (*Id.* ¶ 20, 49–56 (terminating the Remain in Mexico policy and demanding permit compliance for shipping container solution)); *see also United States v. Ducey*, No. 2:22-cv-02107-SMB at 17–19 (demanding, among other things, a writ of ejectment to remove the shipping containers, an injunction against further installation, damages, and remediation). These actions go well beyond ineffective enforcement and provide additional reason why Arizona needed to immediately act to protect the health, welfare, and safety of its citizens.

The political question cases cited by Federal Defendants can also be readily distinguished because, under its original public meaning, "invasion" does not necessarily require entry by another *political entity or sovereign* but instead only requires a hostile entry of *persons*. Traditionally, courts have applied the political question doctrine to avoid overstepping their bounds in thorny issues of foreign policy. *See, e.g., California*, 104 F.3d at 1091. However, a comprehensive analysis of the term "invasion" under its original and historic public meaning, *see* U.S. Const. art. IV, § 4, resolves these concerns and avoids the need to apply the political question doctrine.

Thus far, precedent has provided little textual and historical analysis into the meaning of "invasion." *See California*, 104 F.3d at 1091; *Padavan*, 82 F.3d at 28; *New Jersey*, 91 F.3d at 468; *cf. New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct.

2111, 2126, 2138–56 (2022) (requiring textual and historical analysis to determine whether the Second Amendment right to bear arms includes the right to carry a handgun for self-defense outside the home); *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2248–54 (2022) (same for abortion). Under founding-era dictionaries, armed hostility from another political entity is not a required element of an "invasion." *See* Noah Webster, *A Compendious Dictionary of the English Language* (1806) (defining "invasion" to mean "to enter or seize in a hostile manner"); Noah Webster, *American Dictionary of the English Language* (1828) (defining "invasion to mean "to enter as an enemy, with a view to conquest or plunder; to attack . . . to attack; to assail; to assault; . . . to attack; to infringe; to encroach on; to violate."). Rather, "invasion" simply requires entry in a hostile manner.

Further, the United States Constitution itself contrasts "invasion" with "insurrection," "rebellion," and "domestic violence," *e.g.,* U.S. Const. Art. I Sec. 8 and 9, Art. IV Sec. 4—a fact which even Federal Defendants recognize. (*See* Doc. 24 at 30 (citing 3 J. Story, COMMENTARIES ON THE CONSTITUTION § 1398 (1833) ("Still, a state may be so situated, that it may become indispensable to possess military forces, to resist an expected invasion, *or* insurrection. The danger may be too imminent for delay; and under such circumstances, a state will have a right to raise troops for its own safety, even without the consent of congress." (emphasis added)). The distinction between these varying terms, each of which has different meanings, focuses on locus of hostile activity in foreign and domestic spheres, not on whether the actor is a sovereign entity.

Several founding era sources further confirm that the term "invasion" is not necessarily limited to acts by sovereign nations. For instance, at the Virginia Ratifying Convention, James Madison stated that the activity of smugglers constituted an "invasion" to which the States could respond by making War. *See* James Madison, Debate From Virginia Ratifying Convention (June 16, 1788). Additionally, in Federalist No. 41, Madison worried that, absent a navy, American cities would need to pay tribute to "daring and sudden invaders," defined as "pirates and barbarians." This interpretation would also be consistent with the Articles of Confederation, which provided common defense against external forces

not recognized as sovereigns, like pirates. *See* Articles of Confederation, Article VI, para. 5. States are empowered to address these types of invaders, despite Congress' specific authority over the issue. *See, e.g., State v. Stepansky*, 761 So. 2d 1027, 1031 (Fla. 2000) (state permitted to prosecute piracy despite Constitutional provision granting Congress the right to define piracies and felonies on the high seas under U.S. Const., art. I, § 8, cl. 10).

Construed in accordance with its original meaning, the question of whether the federal government has failed to prevent hostile incursions that impact the health and safety of a state is justiciable. This Court does not need to determine that any particular sovereign is invading the United States—only that persons have entered in a hostile manner and that the State's police powers are implicated. *See* A.R.S. § 26-303(E)(1) ("During a state of emergency . . . [t]he governor shall have complete authority over all agencies of the state government and the right to exercise, within the area designated, all police power vested in this state by the constitution and laws of this state in order to effectuate the purposes of" emergency management).

As such, the traditional concerns underlying the objective political question doctrine concerns do not apply here. First, the Court need not determine that the United States has been "invaded" *by another sovereign* when the political branches have not so declared, therefore avoiding the providence of the political branches over foreign affairs or immigration policy. *California,* 104 F.3d at 1091. Rather, an "invasion" requires only a determination of "hostile entry" by persons. Second, no evaluation of how many illegal immigrants should be said to constitute an "invasion" is required because, again, courts need only evaluate whether there has been a hostile entry. *Id.* And here, the Governor has pled facts sufficient to show such an entry under the original meaning of "invasion." (*See, e.g.*, Doc. 1 ¶¶ 16–30.) Third, this court need not evaluate "the formulation and implementation of immigration policy by the executive branch." *New Jersey*, 91 F.3d at 470. Fourth, Arizona only needs to show that the health, welfare, and safety of its citizens are impacted to enable Arizona to exercise its sovereign right to protect itself.

Moreover, even if the Invasion Clause somehow presents a political question here (it does not), this would not resolve Governor Ducey's arguments under the Self-Defense Clause. This Clause applies when a State is "actually invaded, *or in such imminent danger as will not admit of delay.*" U.S. Const. art. I, § 10, cl. 3 (emphasis added). No declaration of "invasion" is required under this clause. *See* James Madison, Debate From Virginia Ratifying Convention (June 16, 1788) (States "are restrained from making war, unless invaded, or in imminent danger. When in such danger, they are not restrained. I can perceive no competition in these clauses. They cannot be said to be repugnant to a concurrence of the power."); *see also* Federal Defs. Mot. at 30 (citing J Story, *Commentaries on the Constitution* § 1393 (1833) (also recognizing this distinction)); *Melendez v. City of New York*, 16 F.4th 992, 1018 (2d Cir. 2021) ("[A]lthough a state is prohibited from waging war, it may do even that if it is 'actually invaded' or facing 'imminent Danger' not admitting delay.").

While the naturalization clause may represent a textually demonstrable commitment of immigration policy to the political branches (*i.e.*, the orderly administration of migrants adhering to the federal immigration laws), this case does not concern immigration policy. Rather, it addresses Governor Ducey's right to take action, in congruence with his authority to protect the sovereignty of the State of Arizona and under the State's separate police powers, to address the crime facilitated by cartels, to manage the humanitarian issues flooding local border towns, and to protect the health, welfare, and safety of Arizonans in the middle of an undisputed, ongoing emergency crisis. Stated differently, this case asks whether a governor wait for the federal government's permission to protect a state's citizens in an emergency? Because the clear answer is "no," Governor Ducey has stated a claim under the Invasion and Self Defense Clauses.

### E.    An Easement by Federal Defendants does not Overcome Public Safety.

Federal Defendants simply repeat their same objections to Count Five that they raised with respect to Count One (Doc. 24 at 30), including that the QTA applies and provides the only possible source of sovereign immunity waiver (*id.* at 8–11) and any

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2202
602.382.6000

challenge to the Roosevelt Reservation Proclamation is time-barred. (*Id.* at 12). These objections fail for the same reasons detailed above. <u>First</u>, any claimed sovereign immunity defense has been rendered moot by the federal government's decision to sue the Governor (and other State officials) in another suit for trespass damages and remediation. *See supra* pp. 8–9. <u>Second</u>, the QTA does not apply since *Governor Ducey* is not claiming title to any land, which means that the QTA's procedural requirements are irrelevant. *See supra* pp. 9–10. This action cannot be converted into a QTA case simply because the requested declaratory relief may ultimately affirm Federal Defendants' lack of jurisdiction. *Id*. <u>Third</u>, 5 U.S.C. § 702 provides a sovereign immunity waiver. *See supra* pp. 10–12. And finally, to the extent a six-year limitation period even applies, Governor Ducey's claim accrued much less than six years ago. *See supra* pp. 12–13.

## F.     The Governor States a Claim for Federal Common Law Public Nuisance.

Under federal common law, a public nuisance is defined as an "unreasonable interference with a right common to the general public." *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855–56 (9th Cir. 2012) (citing Restatement (Second) of Torts § 821B(1) (1979)).[11] Conduct meets this standard when it interferes significantly with public health, safety, peace, comfort, or convenience, Restatement (Second) of Torts § 821B(2)(a), and has "caused the public-at-large substantial and widespread harm." *Id.* (citing *Missouri v. Illinois*, 200 U.S. 496, 521 (1906); *Am. Elec. Power Co., Inc.*, 582 F.3d at 357 ("The touchstone of a common law public nuisance action is that the harm is widespread, unreasonably interfering with a right common to the general public.")).

---

[11] Federal courts recognize federal common law public nuisance as an appropriate cause of action. *See Michigan*, 667 F.3d at 770; *Illinois v. City of Milwaukee*, 406 U.S. 91, 105 n. 6 (1972) (federal common law governs "where there is an overriding federal interest in the need for a uniform rule of decision or where the controversy touches basic interests of federalism."); *Connecticut v. Am. Elec. Power Co., Inc.*, 582 F.3d 309, 351 & n. 28 (2d Cir.2009) (Hall, J., concurring), *rev'd on other grounds, Am. Elec. Power Co., Inc. v. Connecticut*, 131 S.Ct. 2527 (explaining that "[t]he Restatement definition of public nuisance has . . . been used in . . . federal cases involving the federal common law of nuisance . . . and the Restatement principles have served as the backbone of state nuisance law").

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2202
602.382.6000

Federal Defendants do not actually dispute that the facts alleged in the Complaint rise to the level of a public nuisance. Instead, they argue Governor Ducey's public nuisance claim (Count Six) is barred because it allegedly (1) raises non-justiciable political questions, (2) is barred by sovereign immunity, and (3) has been displaced by Congressional action. (Doc. 24 at 30–34.) All three arguments fail.

**1.    The Governor's Nuisance Claim Does Not Present a Nonjusticiable Political Question.**

In evaluating the political question doctrine, courts consider six factors set forth in *Baker v. Carr*:

1. A textually demonstrable constitutional commitment of the issue to a coordinate political department;

2. A lack of judicially discoverable and manageable standards for resolving the case;

3. The impossibility of deciding the case without an initial policy determination of a kind clearly for nonjudicial discretion;

4. The impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;

5. An unusual need for unquestioning adherence to a political decision already made; and

6. The potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962).

The bar for non-justiciability under this established test is high, and "[u]nless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." *Am. Elec. Power Co., Inc.*, 582 F.3d at 321 (*citing Baker*, 369 U.S. at 217).[12] Even if a case raises "an issue of great importance to the political branches" or triggers "motivated partisan and sectional debate," this does not mean that the case presents non-justiciable political questions. *Id.* at 322 (*citing U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 458 (1992)); *see also Baker,* 369 U.S. at 211, 217 (cautioning that the doctrine "is one of 'political questions,' not one of 'political

---

[12] On appeal, an equally divided Supreme Court split on the issue that no threshold obstacle (standing or political question) bars review, thereby affirming the Second Circuit's exercise of jurisdiction. *See Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 420 (2011).

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2202
602.382.6000

cases'" and that, in the foreign relations sphere, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.").

Rather, the "political question doctrine must be cautiously invoked," *Can v. U.S.,* 14 F.3d 160, 163 (2d Cir. 1994). Further, "[t]he fact that a case may present complex issues is not a reason for federal courts to shy away from adjudication; when a court is possessed of jurisdiction, it generally must exercise it." *Am. Elec. Power Co.*, 582 F.3d at 329 (Hall, J. concurring) (citing *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 404 (1821)).

Here, none of the *Baker* factors preclude review of Governor Ducey's federal common law public nuisance claim. First, there is no textually demonstrable constitutional commitment of federal public nuisance to a coordinate political department, even if this case may tangentially touch on immigration and national security. *Lane v. Halliburton*, 529 F.3d 548, 558 (5th Cir. 2008). Count Six is not fundamentally about the federal government's power over immigration policy, but rather whether Federal Defendants can prevent a governor of a state from redressing a public nuisance in the face of an ongoing emergency crisis and to preserve the health, safety, and welfare of the sovereign State. As such, this is a case of first impression.

Second, federal common law public nuisance cases have judicially discoverable and manageable standards because "well-settled principles of tort and public nuisance law provide appropriate guidance . . . in assessing [the Governor's] claims and the federal courts are competent to deal with these issues." *See Am. Elec. Power Co.*, 582 F.3d at 329 (Hall, J., concurring); *see also Michigan*, 667 F.3d at 771 (applying federal public nuisance definition in the Restatement to the introduction of an invasive, non-native organism into a new ecosystem). In deciding a "long line" of federal common law nuisance cases, federal courts have "employed familiar public nuisance precepts, grappled with complex evidence, and resolved the issues presented, based on a fully developed record." *See id.* at 327–28 & 329 (Hall, J., concurring). This remains true even in light of the unique separation of powers and sovereignty issues in this case, as courts are accustomed to applying federal public nuisance to a "variety of new and complex problems." *See id.* (concluding that "the political

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2202
602.382.6000

- 26 -

implications of the [global warming] suit did not convert what is essentially an ordinary tort suit into a non-justiciable political question.").

    Third, this case can be decided without an initial policy determination of a kind clearly for nonjudicial discretion. Federal public nuisance cases are governed by recognized judicial standards under the federal common law of nuisance, which "obviates any need to make initial policy decisions of the kind normally reserved for nonjudicial discretion." *Kadic v. Karadzic,* 70 F.3d 232, 249 (2d Cir. 1995). For instance, in *Am. Elec. Power Co.*, Plaintiffs brought a public nuisance action against federal agencies for contributing to global warming. There, the court recognized that:

> Plaintiffs' complaints do not ask the district court to decide overarching policy questions such as whether other industries or emission sources not before the court must also reduce emissions or determine how across-the-board emissions reductions would affect the economy and national security. In adjudicating the federal common law of nuisance claim pleaded here, the district court will be called upon to address and resolve the particular nuisance issue before it, which does not involve assessing and balancing the kind of broad interests that a legislature or a President might consider in formulating a national emissions policy.

582 F.3d at 329 (Hall, J., concurring).

    Here too, Governor Ducey is not asking for the judiciary to unseeingly determine as a policy matter how many migrants should be administratively processed across the border, nor which measures are to be taken to enforce immigration law. Nobody disputes this is a federal government prerogative. See *Arizona v. United States*, 567 U.S. 387, 416 (2012). But no policy determination is required here, because there is also no dispute that the district court "may be called upon to decide causation issues and apply a remedy." *Am. Elec. Power Co.*. 582 F.3d at 329 (Hall, J., concurring).  Nor can the ongoing border crisis be disputed. *See* Order Granting Stay of Title 42 Termination Pending Further Order, *Arizona v. Mayorkas*, No. 22A544 (Roberts, C.J.). Finally, a judicial decision on this matter would neither demonstrate a "lack of respect" for the political branches, contravene a "political decision already made," or create the potential for "embarrassment from multifarious pronouncements by various departments on one question." *Am. Elec. Power Co.*, 582 F.3d

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2202
602.382.6000

at 331–32 (Hall, J., concurring). This case does not present a political question, but instead raises important legal issues that demand resolution to avoid chaos.

**2.      The Federal Government Waived Its Sovereign Immunity for Federal Common Law Claims Under § 702 of the APA.**

Federal Defendants wrongly assert that a sovereign immunity waiver for Count Six can only be found in the Federal Tort Claims Act ("FTCA"). But this case—which does not seek damages—does not implicate the FTCA. Waiver instead derives from the federal government's affirmative decision to sue Governor Ducey and other State officials for trespass and remediation. Alternatively, waiver can be found in Section 702 of the APA, which waives sovereign immunity for common law tort claims for equitable relief, including for public nuisance. *Michigan*, 667 F.3d at 776; *see also supra* pp. 10–12.

By contrast, the FTCA does not apply. <u>First</u>, by its terms, "the FTCA does not apply to any federal common-law tort claim, no matter what relief is sought." *Michigan*, 667 F.3d at 776. Instead, state tort law is the source of substantive liability under the FTCA. *Id*. <u>Second</u>, even if the FTCA did apply to tort claims under federal common law, it does not somehow preclude suits for equitable relief. "There is nothing in the FTCA suggesting that Congress meant to forbid all actions that were not expressly authorized," and the argument that the FTCA waives only suits for money damages but "implicitly prohibits injunctive relief in tort suits against the United States" reads too much into congressional silence. *Id*. at 775 (internal citations omitted). To the contrary, courts may grant equitable relief either to abate a public nuisance that is actively occurring or to proactively stop a threatened nuisance from arising. *See State of Georgia v. Tennessee Copper Co. and Ducktown Sulphur, Copper, & Iron Co. (LTD),* 206 U.S. 230, 238–39 (1907) (requiring the plaintiff to show that a defendant's actions "cause and threaten damage").

### 3.      Congress Did Not "Displace" the Public Nuisance Claim.

Federal common law claims for public nuisance may be asserted when the courts are "compelled to consider federal questions which cannot be answered from federal statutes alone." *Native Vill. of Kivalina*, 696 F.3d at 856. "The existence of laws generally applicable to the question is not sufficient . . . ." *Id.* Instead, "the salient question is 'whether Congress

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2202
602.382.6000

has provided a sufficient legislative solution to the particular [issue] to warrant a conclusion that [the] legislation has occupied the field to the exclusion of federal common law.'" *Id*. Relevant considerations to this inquiry include (1) whether Congress has passed a substantive statute that "speaks directly to the interstate nuisance about which the states are complaining," and (2) whether Congress has provided any enforcement mechanism or recourse for any entity or party negatively affected by the nuisance. *Michigan*, 667 F.3d at 780.

Here, no federal law speaks directly to the nuisance at issue. This is not a question of immigration enforcement or environmental policy that could be remedied under any of DHS or Federal Defendants' enabling statutes and regulations. Rather, Governor Ducey's nuisance claim centers around the *downstream consequences* of the federal government's choices due to the influx of crime, drugs, and migrants throughout Arizona. Contrary to Federal Defendants' claim, Congress has not delegated authority to Federal Defendants nor any other agency to directly address this issue—and if it had, Arizona would be vigorously pursuing this avenue. Federal Defendants point to regulations involving forest management, guarding the border, installing physical barriers and roads, and constructing a barrier, but none of these regulations have to do with abating public nuisances created by drug cartels, other criminal actors, or migrant overflow. This responsibility ultimately falls to States and their localities.

Simply put, no regulatory scheme is sufficiently comprehensive to "occup[y] the field" of the federal common law on public nuisance. *Cf. Native Vill. of Kivalina*, 696 F.3d at 856. And because no federal law provides Governor Ducey with an enforcement mechanism or other recourse for injuries caused by open borders, any holding to the contrary would leave the people of Arizona without *any* options to obtain relief against the noncooperation of the federal government.[13] As a principle of federalism, the State must be able to protect its citizenry's property, welfare, and security in the event that the federal

---

[13] To date, other states have been unsuccessful in their attempts to require the federal government to build the border wall. *See, e.g., State of Missouri v. Biden*, No. 22-40110 (5th Cir. 2022).

government abdicates its duties. For example, if there is a flood, wildlife, or pandemic, the State has an inherent right to protect itself. *See, e.g., Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905), (affirming compulsory vaccination by a state during smallpox pandemic because the "safety and the health of the people of Massachusetts are . . . for that commonwealth to guard and protect. They are matters that do not ordinarily concern the national government.); *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (recognizing and deferring to state power to protect the "safety and health of the people" during a public health crisis, where a governor's "latitude 'must be especially broad."); *Xponential Fitness v. Arizona*, No. CV-20-01310-PHX-DJH, 2020 WL 3971908, at *6 (D. Ariz. July 14, 2020) (same).

## IV.    Conclusion

For the foregoing reasons, Governor Ducey respectfully requests that the Court deny Federal Defendants' attempt to dismiss this issue or, in the alternative, redress any deficiency through an amended pleading.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED this 23rd day of December, 2022.

SNELL & WILMER L.L.P.

By: /s/ *Brett W. Johnson*
Brett W. Johnson
Colin P. Ahler
Ryan J. Regula
Charlene A. Warner
1 E. Washington St., Suite 2700
Phoenix, AZ 85004

Anni L. Foster
OFFICE OF ARIZONA GOVERNOR
DOUGLAS A. DUCEY
1700 West Washington Street
Phoenix, Arizona 85007

*Attorneys for Plaintiff Douglas A.*
*Ducey, Governor of the State of*
*Arizona*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I certify that on December 23, 2022, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, which automatically sends a Notice of Electronic filing to all counsel of record.

_s/   Tracy Hobbs_

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2202
602.382.6000